**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-00026** |
| **CHRISTOPHER MICHAEL ALBERTS,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM[1]**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that the Court sentence Christopher Alberts to a high-end Guidelines sentence of 120 months of incarceration, 36 months of supervised release, restitution of $2,000, a fine of $22,186, and mandatory assessment fees totaling $630. Should the Court adopt the draft Presentence Investigation Report ("PSR") calculation of the Guidelines,[2] the Court should vary upwards to a 120-month sentence because Alberts' crime resulted in the serious disruption of government (*see, e.g.*, U.S.S.G. § 5K2.7) and the Guidelines' grouping analysis provides "inadequate scope" for Alberts' possession of multiple weapons in the commission of his offenses, *see, e.g.*, U.S.S.G. § 3D1.4, bkgd. cmt. (upward departure based on grouping); U.S.S.G. § 5K2.6 (possession of weapons).

---

[1] This memorandum reiterates the government's objections to the draft PSR, ECF No. 165, and, if the Court disagrees with the Guidelines analysis set forth herein, serves as a motion for an upward variance from the U.S. Sentencing Guidelines.

[2] As explained below, the PSR incorrectly calculated the total offense level as 28. The total offense level, before variances, should be 30, resulting in a Guidelines range of 97 to 121 months' incarceration.

## I.    INTRODUCTION

During over six hours on Capitol grounds on January 6, 2021, Christopher Alberts violently joined the assault on the United States Capitol, which forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[3]

Alberts, a former National Guardsman from Maryland, arrived in Washington D.C. wearing metal-plated body armor and carrying a concealed, fully loaded firearm (containing hollow point and high-pressure rounds), a gas mask, throat mic, binoculars, bungee cords, and a fully loaded ammunition magazine, among other items. He made his intention clear when he left the "Stop the Steal" rally well before its end to go to the Capitol grounds, yelling along his route that he was, "taking over the Capitol" to "make them know who they work for, they work for us, not the other way around." At a key chokepoint blocking access to multiple entrances to the Capitol Building, Alberts was the first rioter to ascend and reach a staircase landing and the first one to place his hands on a U.S. Capitol Police ("USCP") officer on those stairs. Because he was protected by metal-plated body armor and a gas mask, Alberts was undeterred by the pepper ball and pepper spray measures used by USCP officers to repel the rioters. He grabbed a wooden pallet as he charged up the stairs, using the pallet as a battering ram against the officers guarding the stairwell. He was one of the first fifteen rioters to reach the Upper West Terrace, where others soon

---

[3] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05 That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

breached the Senate Wing Door and entered and occupied the Capitol.

For hours, and often just steps from the Capitol Building, Alberts screamed at police officers that they were "domestic terrorists" and were "treasonous, communist motherfuckers," who were improperly stopping the rioters "from doing what's right." He exclaimed that he and the other rioters were there "to do what we are constitutionally allowed to do" – that is, they had "a right" and "a duty" to overthrow the government of the United States and install a new government. Since his January 6, 2021 arrest, Alberts has expressed no remorse for his crimes, instead seeking praise for being a "hero" and "protector" during his assault on the Capitol while slandering the police officers who valiantly struggled that day to protect it.

Due to his extensive and egregious criminal conduct on January 6 and to deter him and others from wrongdoing, the government recommends that the Court sentence Alberts to 120 months' incarceration, which is at the high end of the advisory Guidelines' range of 97 to 121 months that the government submits is the correct Guidelines calculation.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts accompanying the complaint filed in this case, ECF No. 1, for a brief summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. We now turn to the defendant's conduct.

### B.   Christopher Alberts' Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

Christopher Alberts actively participated in the January 6 attack on the Capitol. His crimes

3

are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the Metropolitan Police Department, open-source video, and Capitol surveillance footage.

Alberts traveled from his home in Maryland to attend the Stop the Steal rally near the Ellipse in Washington, D.C. on January 6, 2021. Alberts brought with him a two-way radio, earpiece, throat mic, bungee cords, binoculars, flashlight, MRE (meal-ready-to-eat kit), a medical and decontamination kit, ski mask, gas mask, body armor with Level IV metal plates, two knives, and a chambered 9-millimeter pistol loaded with thirteen hollow point and high pressure rounds, and an extra magazine loaded with twelve rounds of similar ammunition. Testimony at trial documented the extensive protection provided by the armor's metal plates and the dangerous characteristics of the 25 rounds of ammunition carried by Alberts.

At approximately 12:38 p.m., while former President Donald Trump was still addressing the "Stop the Steal" rally, Alberts started walking towards the Capitol building. He explained that he "was not focused on his speech at all." Trial Tr. at 798:21-22. As he traveled, Alberts recorded a video of himself yelling, "Taking over the Capitol Patriots, let's go!" and "Make them know who they work for. They work for us, not the other way around." *See* Government Trial Exhibit 508. Alberts stated at trial that he arrived at the Peace Circle at around 12:58 p.m. Trial Tr. at 925:4-8. The Peace Circle perimeter around the Capitol was breached just before 1:00 p.m. Trial Tr. at 196:13-19.

At approximately 1:04 p.m., Alberts reached the West Lawn area near the Pennsylvania Avenue Walkway, just below the Northwest Steps – well within the restricted perimeter and on the Capitol grounds. Trial Tr. at 604:15-22. To reach that location, Alberts saw or passed through

various barriers, including snow fencing, bike rack barricades, the Olmstead Wall, and lines of police officers. Trial Tr. at 194:8-21. Outmanned police officers, barricades, snow fencing, and signs were readily visible. Trial Tr. at 1030:12-25. Bicycle racks "were everywhere," and the only people behind the barriers at the time were police officers. Trial Tr. at 1032:7-8 & 1032:25 – 1033:2.

At around 1:10 p.m., Alberts told other rioters who were interfering with United States Capitol Police (USCP) officers, "We'll get them soon."[4] Def. Trial Ex. 407. Alberts donned his gas mask at around 1:20 p.m., waved to the crowd, and confronted riot police, yelling, "you've got the wrong motherfucker, you see that right there?" (while pointing to military patches on his body armor). *See* Government Trial Exhibit 302; Trial Tr. at 608:20-25 & 612:3-16.



---

[4] Alberts testified that he believed that he said, "We'll get up there soon. Like to not worry, there was no need to rush up to get to the steps." Trial Tr. at 967:7-8.

*Government Trial Exhibit 301, showing Alberts wearing an earpiece, body armor,*

*military backpack, firearm, and knife as he approached the Capitol Building*



*Government Trial Exhibit 406, showing a frontal view of Alberts wearing a gas mask, gas*

*mask bag, radio kit, and body armor as he approached the Capitol Building.*

### Alberts' Actions on Northwest Steps

At approximately 1:48 p.m., with his gas mask on, Alberts climbed a metal bike rack barrier

to reach and progress up the Northwest Steps. Trial Tr. at 613:10-22. USCP officers were guarding

that stairwell to prevent rioters from reaching the Upper West Terrace, which had far more points

of access to the Capitol Building than the Lower West Terrace. Trial Tr. at 433:25 – 434:12. USCP

6

officers deployed OC spray and pepper balls to stop Alberts and other rioters from moving up the stairwell. While these measures succeeded in incapacitating some rioters—including Guy Reffitt, the first January 6 defendant who stood trial, *see United States v. Reffitt*, 21-cr-32 (DLF)—Alberts—protected by his gas mask and body armor—was able to continue his advance on the Capitol building. Trial Tr. at 438:22-25; 941:11-19; & 949:8-10. At 1:54 p.m., he was the first rioter to go hands-on with a USCP officer on the Northwest Steps. *See* Government Trial Exhibit 411; Trial Tr. at 440:14-16 ("Q. Who was the first individual on that stairwell to have gone hands-on with an officer? A. That would be him [Alberts]"); 619:9-15.



*Government Trial Exhibit 411, showing Alberts grabbing a USCP Officer while*

*advancing up the Northwest Steps*

Alberts then picked up and brandished a large wooden pallet, grappled with a USCP officer to retain control of the pallet, and used it as a makeshift battering ram as he charged the USCP officers at the top of the steps and attempted to break through their position. Trial Tr. at 441:1-21; *See* Government Trial Video Exhibit 308; Government Trial Exhibit 415.



*Government Trial Exhibit 415, showing Alberts with his wooden pallet at the top of the*

*Northwest Steps landing*

Alberts was the first rioter to reach the Northwest Steps landing and to push against the police line there, making physical contact with the officers. Trial Tr. at 440:8-13; 946:17-25; *See* Government Trial Exhibit 215. The USCP officers were able to force Alberts back down the steps before another rioter discharged pepper spray at the officers. Trial Tr. at 948:2-10. Alberts was on the Northwest Steps for a total of 22 minutes. Trial Tr. at 625:3-6.

8



*Government Trial Exhibit 215, showing Alberts' position at the head of the mob*

*attempting to breach the Upper West Terrace*

Once the landing was overrun, Alberts was about the fifteenth person to charge up the stairs, at the forefront of many other rioters. Trial Tr. at 623:16-20. He waved to those behind him multiple times, encouraging them to follow. Trial Tr. at 625:3-13. *See* Government Trial Exhibit 422.



*Government Trial Exhibit 422*

"After Alberts was in that first charge of folks going up the staircase, basically the floodgates opened, and everybody from that area is able to go up that staircase." Trial Tr. at 623:4-6. At the top of the Northwest Steps, Alberts and the other rioters reached a final line of bicycle racks. Trial Tr. at 954:19- 955:1. Alberts observed that those areas were cordoned off, with uniformed officers standing between the rioters and the Capitol Building. Trial Tr. at 955:13-16. The rioters forced their way through barricades and police lines and took the Upper West Terrace. Hundreds of other rioters then forced their way into the Capitol Building through the Senate Parliamentarian and Senate Wing doors that were at the location of Alberts' breach of the Upper West Terrace. Trial Tr. at 286:9-18; *See* Government Video Exhibit 1.

As a result of Alberts' assault on the USCP officers as part of a mob of rioters at the stairwell, officers were forced to fall back from the bike rack perimeter on the Upper West Terrace, the Capitol Building was breached, and for several hours Congress was prevented from continuing with its Constitutional and statutory obligation to certify the results of the 2020 presidential election.

As others invaded the Capitol Building, Alberts was temporarily sidelined by the OC spray used by the USCP Officers. Trial Tr. at 956:5-8. *See* Government Trial Exhibit 425. As Alberts remained on Capitol Grounds for another six hours, his "blood was boiling." Trial Tr. at 950:25 – 951:2; 958:19-20. At one point, he berated a line of MPD officers who had arrived to reinforce the USCP officers. Alberts shouted insults at them during the height of the battle, calling them "domestic terrorists" and "treasonous, communist motherfuckers."

Alberts also stated that if the officers would only step aside, he and the other patriots would "wipe them[5] all out" in a matter of days. *See* Government Video Exhibit 2; Government Image Exhibits 1-4. Alberts complained that the officers were preventing him and other rioters from "doing what's right," and that it was his duty "to overthrow the government and reinstate a new government for the people." As Alberts later stated during a podcast interview[6], he believed that his "constitutional rights are bigger than yours." At approximately 4:27 p.m., Alberts was still on the Upper West Terrace screaming at police officers who were attempting to regain control of the area.

---

[5] Contextually, wipe "them" all out likely referred to Congress as well as Antifa and BLM. In the same rant, Alberts stated, "*they're* going to tax y'all to poverty just as *they're* going to tax us to poverty. And y'all think when *they* take all the guns away y'all are gonna be the only ones left with them. Y'all got a rude awakening on that one."

[6]    https://player.fm/series/freedom-unchained/ep-17-hope-truth-bombs-cpac-chris-alberts    at 49:05.



*Government Image 1*



*Government Image 2*



*Government Image 3*



*Government Image 4*

Around 4:40 p.m., Alberts urinated on a wall of the U.S. Capitol Grounds while yelling, "fuck D.C. Metro." *See* Government Image 5.

13



*Government Image 5*

Alberts then circled back around to the West Front and rejoined a line of rioters who refused to leave. Alberts and other rioters confronted a line of police officers. As the other rioters threw various objects at the officers, including a chair and bike rack, Alberts joined in and threw a bottle at the police line.[7] *See* Government Video Exhibit 3. Alberts later shined his flashlight into the faces of officers before retrieving a bullhorn and using it to berate the officers. Trial Tr. at 915:4-15.

---

[7] Alberts testified that he threw the water bottle at the officers' feet, Trial Tr. at 894:17-18, but that statement is belied by a video of the incident.

14



*Still Shot from Government Trial Exhibit 315*

Alberts remained on the Capitol Grounds for three more hours, continuing to yell through the bullhorn at uniformed officers. At 7:22 p.m., after Alberts had been unlawfully present on Capitol Grounds for over six hours, an officer observed a bulge on Alberts' right hip. Officers frisked Alberts and seized a loaded firearm, then arrested him. Alberts admitted to MPD Detectives and at trial that he carried the ready-to-fire 9-millimeter semi-automatic pistol, loaded with thirteen bullets (some of which were hollow point) and an extra magazine for the entire day, including during his assault on the West Terrace stairwell.

### III.    THE CHARGES AND CONVICTION AT TRIAL

On November 10, 2021, a federal grand jury returned a second superseding indictment charging Christopher Alberts with the following ten counts:

- Count One – Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)
- Count Two – Assaulting, Resisting or Impeding Certain Officers, in violation of 18

15

U.S.C. § 111(a)(1)

- Count Three – Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon or Firearm, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A)
- Count Four – Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon or Firearm, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A)
- Count Five – Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4)
- Count Six – Unlawful Possession of a Firearm on Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(1)(A)(i)
- Count Seven – Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D)
- Count Eight – Act of Physical Violence in the Capitol Grounds or Building, in violation of 40 U.S.C. § 5104(e)(2)(F)
- Count Nine – Carrying a Pistol Without a License Outside Home or Place of Business, in violation of 22 D.C. § 4504(a)
- Count Ten – Possession of a Large Capacity Ammunition Feeding Device, in violation of 22 D.C. § 2506.01(b)

On December 21, 2022, the Court granted the Government's Consent Motion to Dismiss Count Ten of the Second Superseding Indictment.

On April 19, 2023, Christopher Alberts was convicted of the remaining offenses (Counts One through Nine) following a jury trial.

## IV.  STATUTORY PENALTIES

Christopher Alberts now faces sentencing on Counts 1 through 9. As acknowledged by the Presentence Report issued by the U.S. Probation Office, Alberts faces up to:

- Counts One (Civil Disorder): The maximum term of imprisonment is five years for this Class D Felony.
- Count Two (Assaulting, Resisting or Impeding Certain Officers): The maximum term of imprisonment is eight years for this Class D Felony.
- Count Three (Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon or Firearm) and Count Four (Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon or Firearm): The maximum term of imprisonment is 10 years for these Class C Felonies.

16

- Count Five (Engaging in Physical Violence in a Restricted Building or Grounds): The maximum term of imprisonment is one year for this Class A Misdemeanor.
- Count Six (Unlawful Possession of a Firearm on Capitol Grounds or Buildings): The maximum term of imprisonment is five years for this Class D Felony.
- Count Seven (Disorderly Conduct in a Capitol Building or Grounds) and Count Eight (Act of Physical Violence in the Capitol Grounds or Building): The maximum term of imprisonment is six months for these Class B Misdemeanors.
- Count Nine (Carrying a Pistol Without a License Outside Home or Place of Business): The maximum term of imprisonment is five years for this Class D (D.C.) Felony.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). We submit the following analysis applies to Alberts' conduct and convictions:

**Count One: 18 U.S.C. § 231(a)(3)—Civil Disorder**

Since there is no applicable Chapter Two Guideline for Count One in the Statutory Appendix, use "the most analogous guideline." *See* U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base offense level | 10 | Pursuant to U.S.S.G. § 2A2.4(a), the Base Offense Level is 10 |
| --- | --- | --- |
| Specific offense characteristic: physical contact. | +3 | Pursuant to U.S.S.G. § 2A2.4(b)(1), "If (A) the offense involved physical contact … increase by 3 levels." <br><br> Alberts went "hands on" with police and charged the police line with a wooden pallet, making contact with police. Accordingly, his offense involved physical contact. |
| Cross reference | *See* below | Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." The Application Notes to Section 2A2.2, in turn, define "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) |

17

with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.

The Guidelines do not define "assault" or "felonious assault." Sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (defendant assaulted a police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979).

Here, Alberts' conduct constituted an aggravated assault, and thus the cross-reference applies. First, Alberts went hands-on with a USCP Officer on the Northwest Steps. Second, Alberts used a wooden pallet as a battering ram against the line of officers at the top of the Northwest Steps. Third, Alberts committed these assaultive acts with the intent to commit another felony, namely 18 U.S.C. § 231(a)(3) (of which he was convicted). Accordingly, Alberts's conduct constituted aggravated assault as defined under U.S.S.G. § 2A2.2 cmt. n.1, and therefore the cross-reference to U.S.S.G. § 2A2.2 applies.

| Base offense level | 14 | Pursuant to U.S.S.G. § 2A2.2(a), the Base Offense Level is 14. |
|---|---|---|
| Special offense characteristic: Dangerous Weapon | +4 | Pursuant to U.S.S.G. §2A2.2(b)(2)(B): If a dangerous weapon was used, increase by 4 levels.<br><br>Application Note 1 states that "dangerous weapon" "has the meaning given that term in §1B1.1, Application Note 1, and includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such instrument is involved in the offense with the intent to commit bodily injury." Section 1B1.1, Application Note 1, states that "'Dangerous weapon' means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (*e.g.* a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)."<br><br>Because a dangerous weapon was used (specifically—the wood pallet used as a makeshift battering ram as the defendant charged the USCP officers at the top of the steps, and attempted to break through their position), four levels are added. |
| Special offense characteristic: More than minimal planning | +2 | Pursuant to U.S.S.G. § 2A2.2(b)(1): "If the assault involved more than minimal planning, increase by 2 levels."<br><br>Alberts brought various items with him to the Capitol riot -- including body armor with metal plates, a gas mask, a loaded firearm with hollow point bullets and an extra magazine -- that demonstrate his intent and plan to cause a civil disorder and engage in violent behavior. As Alberts walked towards the U.S. Capitol Building on January 6th, he recorded a video of himself yelling, "Taking over the Capitol Patriots, let's |

| | | |
|---|---|---|
| | | go!" Later, his use of the body armor and gas mask enabled him to overwhelm officers at the West Terrace stairwell. After January 6th, Alberts gave an interview in which he stated that he brought his gas mask to defend against officer pepper spray, "because I knew that shit was coming eventually." |
| Victim-related adjustment | +6 | U.S.S.G. §3A1.2(b) – Official Victim<br><br>Read together, U.S.S.G. §3A1.2(a) and (b) apply a +6 level enhancement if the victim was a government officer or employee, Alberts' criminal action was motivated by the victim's status, and the applicable base offense level Guideline is from Chapter Two, Part A (Offenses Against the Person).<br><br>Here, the victims -- the group of police officers at the Northwest Steps, fighting against Alberts and others -- were U.S. Capitol Police Officers wearing uniforms. The USCP officers are all federal government employees. U.S.S.G. § 3A1.2(a)(1).<br><br>Alberts's conduct against the police officers at the Northwest Steps was "motivated by [their] status" as government officers, *see* U.S.S.G. §3A1.2(a)(2), because they were blocking him and other rioters from accessing the Upper West Terrace. He forcibly opposed and assaulted them for no other reason than that they were performing their sworn duties as law enforcement officers tasked with guarding the Capitol, or in his own words, they were "treasonous, communist motherfuckers" and were "domestic terrorists."<br><br>Because U.S.S.G. § 3A1.2(a)(1) and (2) apply, and "the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)," the +6 level enhancement found in § 3A1.2(b) is applicable. |

| | | |
|---|---|---|
| Adjustment: Obstruction | +2 | U.S.S.G. §3C1.1: "If the defendant willfully obstructed or impeded or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by two levels." Such conduct includes "committing … perjury." U.S.S.G. § 3C1.1, cmt. n. 4(B).<br><br>Alberts perjured himself at trial by testifying that he: (1) did not know the Capitol building was restricted and he never encountered any police officer, fencing, or warning that the area was restricted on his way to the Lower West Terrace, (2) only brought a gas mask to provide efficient medical care to women and children and that he only had bungee cords for camping, (3) was unable to understand the verbal commands and hand gestures from US Capitol Police officers at the top of the West Terrace stairwell, (4) didn't go back down the stairwell after U.S. Capitol Police deployed non-lethal measures like pepper spray because he hadn't been trained on moving backwards, (5) only picked up the wooden pallet that he later used as a battering ram because it was placed at his feet and he wanted to dispose of it, and (6) only waved to other rioters from the stairwell because he wanted them to join him on the stairwell to assist in bringing an injured protestor down. The government's evidence at trial, summarized above, proved this testimony was demonstrably false. The jury's verdict of guilty also shows that it rejected this testimony as false. |
| **Total** | **28** | |

**Count Two: 18 U.S.C. § 111(a)(1)— Assaulting, Resisting, or Impeding Certain Officers**
*(Alberts' assault on the USCP and MPD officers on the Northwest Stairs)*

The Statutory Index references two guidelines for 18 U.S.C. §111, U.S.S.G. §§ 2A2.2 (Aggravated Assault) and 2A2.4 (Obstructing or Impeding Officers).

| Base offense level | 14 | Pursuant to U.S.S.G. § 2A2.4(a) (Obstructing Officers), the Base Offense Level is 10; however, pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)."<br><br>As shown in the analysis for Count One, Alberts' conduct constituted aggravated assault, and therefore the most appropriate guideline is U.S.S.G. § 2A2.2. |
|---|---|---|
| Special offense characteristic | +4 | Pursuant to U.S.S.G. § 2A2.2(b)(2)(B): If a dangerous weapon was used, increase by 4 levels.<br><br>See analysis above |
| Special offense characteristic | +2 | U.S.S.G. § 2A2.2(b)(1): "If the assault involved more than minimal planning, increase by two levels."<br>See analysis above. |
| Victim-related adjustment | +6 | U.S.S.G. § 3A1.2(b) – Official Victim<br><br>Read together, U.S.S.G. § 3A1.2(a) and (b) apply a +6 level enhancement if the victim was a government officer or employee, the defendant's criminal action was motivated by the defendant's status, and the applicable base offense level Guideline is from Chapter Two, Part A (Offenses Against the Person).<br><br>See analysis above.<br><br>Because U.S.S.G. § 3A1.2(a)(1) and (2) apply, and "the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)," the +6 level enhancement found in § 3A1.2(b) is applicable. |

22

| Obstruction | +2 | U.S.S.G. §3C1.1: "If the defendant willfully obstructed or impeded or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."<br><br>See analysis above. |
| --- | --- | --- |
| **Total** | **28** | |

**Count Three: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)—Entering and Remaining on Restricted Grounds with a Deadly or Dangerous Weapon**
*(Alberts' entry and remaining on Capitol grounds in possession of a firearm loaded with hollow point bullets)*

The Statutory Index lists two guidelines for this offense, U.S.S.G. §§ 2A2.4 (Obstructing or Impeding Officers) and 2B2.3 (Trespass).

| Base offense level: | 4 | U.S.S.G. § 2B2.3(a) |
| --- | --- | --- |
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): If the trespass occurred "at any restricted building or grounds," increase by 2 levels.<br><br>On January 6, 2021, the U.S. Capitol grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(2): "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." Here the jury convicted Alberts of possessing a loaded firearm. |
| Cross Reference | *See* below | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |

| Base offense level | 14 | U.S.S.G. § 2X1.1(a): "Base Offense Level: The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Alberts entered and remained in the restricted area of the U.S. Capitol grounds, possessing a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1), for the purpose of obstructing or interfering with law enforcement officers at the Northwest Steps who were engaged in the lawful performance of official duties during a civil disorder, in violation of 18 U.S.C. § 231. Alberts obstructed and interfered with these officers as described above. Therefore, the substantive offense is Count One, charging Civil Disorder, and the adjusted offense level for that count applies here. |
| Special offense characteristic | +4 | Pursuant to U.S.S.G. § 2A2.2(b)(2)(B): If a dangerous weapon was used, increase by 4 levels.<br><br>See analysis above |
| Special offense characteristic – more than minimal planning | +2 | U.S.S.G. § 2A2.2(b)(1): *see* analysis above |
| Victim related adjustment – official victim | +6 | U.S.S.G. § 3A1.2(c): If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable (1) knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom; . . . increase by 6 levels.<br><br>Here, Alberts went hands-on with a USCP officer on the Northwest steps to retain control of the wooden pallet and then used that same pallet as a battering ram to assault the officers. The officers were in full uniform and wearing riot control gear. During his testimony at trial, Alberts admitted knowing these individuals were law enforcement officers. |

24

| Obstruction – false testimony | +2 | U.S.S.G. §3C1.1: see analysis above |
|---|---|---|
| Total | **28** | |

**Count Four: 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) — Disorderly and Disruptive Conduct in a Restricted Building or Grounds With a Deadly or Dangerous Weapon**
*(Alberts' disorderly and disruptive conduct on restricted grounds while in possession of a firearm loaded with hollow point bullets)*

The Statutory Index references two guidelines for 18 U.S.C. § 1752(a)(2), U.S.S.G. § 2A2.2 (Aggravated Assault) and U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers).

| Base offense level | 10 | Pursuant to U.S.S.G. § 2A2.4(a), the Base Offense Level is 10. |
|---|---|---|
| Special offense characteristic - physical contact | +3 | Pursuant to U.S.S.G. § 2A2.4(b), "If (A) the offense involved physical contact … increase by 3 levels."<br><br>As set forth above, Alberts made physical contact with police. |
| Cross Reference | See below | Pursuant to § 2A2.4(c), "If the conduct constituted aggravated assault, apply 2A2.2 (Aggravated Assault)."<br><br>See analysis above. |
| Base offense level | 14 | Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)."<br><br>See analysis above. |
| Special offense characteristic – dangerous weapon | +4 | U.S.S.G. § 2A2.2(b)(2)(B): see analysis above |
| Special offense characteristic – more than minimal planning | +2 | U.S.S.G. § 2A2.2(b)(1): see analysis above |
| Victim Related Adjustment – official victim | +6 | U.S.S.G. § 3A1.2(c): see analysis above |
| Adjustment: Obstruction | +2 | U.S.S.G. §3C1.1: see analysis above |

| Total | 28 | |
|---|---|---|

**Count Five: 18 U.S.C. § 1752(a)(4): Engaging in Physical Violence in a Restricted Building or Grounds (Alberts' engaging in an act of physical violence on Capitol grounds)**

| Base offense level | 4 | U.S.S.G. § 2B2.3 |
|---|---|---|
| Special offense characteristic - physical contact | +3 | Pursuant to U.S.S.G. § 2A2.4(b), "If (A) the offense involved physical contact … increase by 3 levels." <br><br> As set forth above, Alberts made physical contact with police. |
| Cross Reference | See below | Pursuant to § 2A2.4(c), "If the conduct constituted aggravated assault, apply 2A2.2 (Aggravated Assault)." <br><br> See analysis above. |
| Base offense level | 14 | Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." <br><br> See analysis above. |
| Special offense characteristic – dangerous weapon | +4 | U.S.S.G. § 2A2.2(b)(2)(B): see analysis above |
| Special offense characteristic – more than minimal planning | +2 | U.S.S.G. § 2A2.2(b)(1): see analysis above |
| Victim Related Adjustment – official victim | +6 | U.S.S.G. § 3A1.2(c): see analysis above |
| Adjustment: Obstruction | +2 | U.S.S.G. §3C1.1: see analysis above |
| **Total** | **28** | |

**Count Six: Unlawful Possession of a Firearm on Capitol Grounds, 40 U.S.C. § 5104(e)(1)(A)** *(Alberts' entry and remaining on Capitol grounds in possession of a firearm loaded with hollow point bullets)*

26

The Statutory Index references U.S.S.G. § 2K2.5 (Possession of Firearm or Dangerous Weapon in Federal Facility) for 40 U.S.C. § 5104(e)(1)(A).

| Base Offense Level | 4 | U.S.S.G. § 2K2.5 (Possession of Firearm or Dangerous Weapon in Federal Facility) |
|---|---|---|
| Special offense characteristic | +3 | U.S.S.G. § 2K2.5(c)(1)(A): "If the defendant used or possessed any firearm or dangerous weapon in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or dangerous weapon with knowledge or intent that it would be used or possessed in connection with another offense, apply . . . § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense if the resulting offense level is greater than that determined above."<br><br>As set forth above, Alberts made physical contact with police. |
| Cross Reference | *See* Analysis for Count 1 | U.S.S.G. § 2K2.5(c)(1)(A): "If the defendant used or possessed any firearm or dangerous weapon in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or dangerous weapon with knowledge or intent that it would be used or possessed in connection with another offense, apply . . . § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense if the resulting offense level is greater than that determined above."<br><br>As with the cross-reference to § 2X1.1(a) under the § 2A2.2 guideline for Count 1, the base offense level is determined by application of § 2A2.2. After applying the pertinent specific offense characteristics to the adjusted base offense level, the total offense level is 14. |
| Base offense level | 14 | U.S.S.G. § 2A2.4(a), cross-referenced to § 2A2.2(a)<br><br>Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." |

| | | See the analysis above. |
|---|---|---|
| Special offense characteristic – dangerous weapon | +4 | U.S.S.G. § 2A2.2(b)(2)(B): see analysis above |
| Special offense characteristic – more than minimal planning | +2 | U.S.S.G. § 2A2.2(b)(1): see analysis above |
| Victim Related Adjustment – official victim | +6 | U.S.S.G. § 3A1.2(c): see analysis above |
| Adjustment: Obstruction | +2 | U.S.S.G. §3C1.1: see analysis above |
| **Total** | **28** | |

_Counts Seven and Eight:_ The U.S. Sentencing Guidelines do not apply to Class B misdemeanor offenses.

_Count Nine_: Carrying a Pistol Without a License: 22 D.C. Code § 22-4504(a): Classified as a Group M8 Offense under the D.C. Sentencing Guidelines. The D.C. guideline range for a Group 8 Offense and Criminal History Category A is 6 to 24 months.

## **Grouping**

Pursuant to U.S.S.G. § 3D1.2(a), there are two separate groups of the counts of conviction, both of which involve the same victims and/or the same act or transaction. Group One consists of Count One, charging Civil Disorder in violation of 18 U.S.C. § 231; Count Two, charging Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a), and Count Five, charging Engaging in Physical Violence, in violation of 18 U.S.C. § 1752(a)(4). Each of these offenses relates to Alberts's interference with a line of USCP and MPD officers defending the Northwest Steps Capitol Building, and therefore the USCP and MPD officers are the victim. The offense level for each of these counts is 28, and therefore the offense level for Group One is 28. Group Two consists of Counts Three, Four, and Six which charge Entering or Remaining on Restricted Grounds in violation of § 1752(a)(1), Disorderly or Disruptive Conduct on Restricted Grounds, in violation of 18 U.S.C. § 1752(a)(2), and Count Six, Unlawful Possession of a Firearm

28

on Capitol Grounds, 40 U.S.C. § 5104(e)(1)(A). These counts relate to Alberts' conduct on restricted grounds and Capitol grounds, for which Congress is the victim. The offense level for each of these counts is 28[8], and therefore the offense level for Group Two is 28.

## Multiple Count Adjustment

Pursuant to U.S.S.G. § 3D1.4, one unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious.

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 | 28 | 1.0 |
| Group 2 | 28 | 1.0 |
| **Total Number of Units:** | | 2.0 |

Pursuant to U.S.S.G. § 3D1.4, based on the calculated 2.0 units, the highest offense level (28) should be increased by 2 levels to 30.The U.S. Probation Office calculated Alberts' criminal history as category I, which is not disputed. PSR ¶ 80. Accordingly, based on the government's calculation of Alberts' total adjusted offense level, at 30, Alberts' Guidelines imprisonment range is 97 to 121 months' imprisonment. For completeness, we now address several of the enhancements added to the government's guidelines calculation, as discussed above.

---

[8]  The Government's objection to the Draft PSR (ECF No. 165) did not include the full adjustment to the offense levels to incorporate all relevant special offense characteristics and adjustments under U.S.S.G. § 2X1.1(a): "Base Offense Level: The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." However, there is no change to the Government's calculation of the appropriate combined offense level under U.S.S.G. § 3D1.4.

**Two-Level Upward Adjustment for Obstruction of Justice**

Pursuant to U.S.S.G. § 3C1.1 (Obstructing or Impeding the Administration of Justice), the offense level should be increased by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," including by providing "materially false testimony" during trial. U.S.S.G. § 3C1.1, n.4. The government asserts that Alberts made multiple materially false statements to deny culpability, mischaracterize his criminal conduct as "heroic," and avoid responsibility, including the following:

o   Alberts testified that on his journey to the U.S. Capitol Building and when he was on Capitol grounds, he did not encounter any police officer, fence, or warning that the area was restricted. *See, e.g.,* Trial Tr. at 806:22 – 808:1. Alberts testified that he did not know the building was restricted. Trial Tr. at 807:12-13. However, a USCP Captain testified that it would have been impossible for Alberts to not have come across at least one of those barriers or to be completely unaware that the area was restricted, given that Alberts reached the West Terrace by approximately 1:04 p.m., and the evidence at trial established that, by that time, numerous barriers, snow fencing, and police officers stood between Alberts and the Capitol. Trial Tr. at 194:8-21. Defense witness David Sumrall, reviewing Defense Trial Exhibit 232, confirmed that Alberts was near him in an area where multiple police officers, barricades, snow fencing, signs, and bicycle racks were visible. Trial Tr. at 1030:12 – 1032:17. Sumrall explained that bicycle racks "were everywhere" and that he was "confused" because "we were trying to gain access and see why it [access to the Capitol grounds] was locked." Trial Tr. at 1032:7-17. The jury also rejected Alberts' claim beyond a reasonable doubt as it convicted him of knowingly entering or remaining on restricted grounds.

o   On direct examination, Alberts testified that all of the items he brought with him to the Capitol were for the purpose of defending himself. Alberts initially testified that he brought his gas mask for protection after watching a video of a protestor being pepper sprayed by a counter-protestor online. Trial Tr. at 790:5-10. Alberts also testified that he put on his gas mask only to provide efficient medical care to women and children who were being affected by the OC spray. Trial Tr. at 823:3-12. However, the evidence introduced at trial showed Alberts used his gas mask to immunize himself from the officers' attempts to defend the Capitol Building and advance up the stairwell ahead of the mob. Trial Tr. at 438:22-25. Similarly, Alberts testified that he only had bungee cords with him because "they were in the bag." Trial Tr. at 965:17-19.

30

o   Alberts testified that he was unable to hear, understand, or decipher the verbal commands and hand gestures from Sergeant Adam DesCamp as DesCamp attempted to get Alberts to move down the West Terrace stairwell. Trial Tr. at 940:23 – 941:2. However, at trial, Sergeant DesCamp and Officer Shauni Kerkhoff demonstrated their hand gestures, and those hand gestures were obvious and unambiguous. Trial Tr. at 428:7-14; 432:19 – 433:6. Alberts also could hear Guy Reffitt during their conversation on the Northwest Steps. Trial Tr. at 939:24 – 940:13. Additionally, DesCamp and Kerkhoff each testified that they deployed pepper balls and OC spray to force the rioters down the stairwell, so their intent was clear. Trial Tr. at 433:7-23.

o   Alberts testified that he did not retreat down the stairwell after facing the OC spray and pepper balls because he had not been trained to move backwards and it was not something he was accustomed to doing. Trial Tr. at 835:4-13. But Alberts admitted on cross-examination that his intent always was to reach the top of the steps, next to the Capitol Building. Trial Tr. at 950:19 – 951:18. The video evidence introduced at trial made clear that no special training was required for Alberts to have walked back down the stairwell and exited the Capitol Grounds.

o   Alberts testified that he only picked up the wooden pallet because it was placed at his feet and he intended to dispose of it. Trial Tr. at 836:2 – 837:14. Alberts testified that as he charged up the stairs, he did not intend to hurt anyone or breach the police line. His testified that his only purpose was to put as much distance as possible between the police and the protestors behind him because he felt lives were at risk. Trial Tr. at 837:15–25. However, Alberts picked up the pallet when it was put down by a fellow rioter as both reached the USCP officers at the Northwest Steps. The other rioter discarded the pallet as he wrestled a plastic police shield away from an officer. Alberts immediately grabbed the pallet and advanced to breach the police line and clear the stairwell for the rioters. *See* Government Trial Exhibits 308, 309, and 413.



*Government Trial Exhibit 413: Alberts retrieves wooden pallet as other rioter wrestles plastic police shield*

Alberts grappled with one USCP officer to retain control of the wooden pallet. Alberts did not use the wooden pallet to shield any other rioter and did not remain on the stairwell to render medical aid. And once Guy Reffitt stopped advancing – before Alberts ascended the stairs – the officers ceased using non-lethal munitions against him. Trial Tr. at 941:11 – 19. Upon consideration of the evidence presented at trial, the Court ruled that no reasonable juror could have found that Alberts was reasonably acting in defense of others when he assaulted the officers at the top of the stairwell during the lawful performance of their duties.

o   Alberts testified on direct examination that after the West Terrace Stairwell was breached, he waved to the crowd as he moved up the stairs to encourage others to come help him bring an injured protestor down. Trial Tr. at 831:3-11. However, on cross examination, Alberts then admitted that he waved to encourage other rioters to make it up the stairs and ensure their voices were heard by members of Congress. Trial Tr. at 953:16-18.

As the foregoing amply illustrates, Alberts' trial testimony was untruthful with respect to several material matters, and he testified untruthfully about these material matters that were

designed to substantially affect the outcome of the case. Accordingly, the Chapter 3 adjustment for obstruction of justice applies in the instant case. *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (§ 3C1.1 enhancement is properly applied when a defendant testified falsely about a material matter at trial).

### Two Level Upward Adjustment for More than Minimal Planning

As used in Section 2A2.2(b)(1), "more than minimal planning" means "more planning than is typical for commission of the offense in a simple form." U.S.S.G. § 2A2.2, cmt. n. 2; *see also United States v. Coombs*, 823 F. App'x 613, 617 (10th Cir. 2020) (unpublished) (affirming application of "more than minimal planning enhancement" where defendant attacked the victim inside a public women's restroom in a national park with bear repellent after he had wrapped his face in toilet paper). Here, as detailed above, Alberts went to great lengths to prepare for January 6, 2021, including the possibility that he would encounter and engage in violence that day. He brought various items with him to the Capitol riot, including body armor with metal plates, a gas mask, a loaded firearm with hollow point bullets and an extra magazine. He also recorded himself stating, "taking over the Capitol Patriots!" before relying on his body armor and gas mask to push past the non-lethal riot control measures and to assault the officers on the West Terrace stairwell. At or around 1:04 p.m.—over an hour before the mob overwhelmed USCP officers and breached the Upper West Terrace—Alberts assured other rioters that, "we'll get them soon," or, as he claimed, "We'll get up there soon." Trial Tr. at 967:7-8.

Alberts also gave an interview in which he stated that he brought his gas mask to defend against pepper spray because "he knew that shit was coming eventually." This is more planning than went into many of the assaults committed by rioters at the Capitol on January 6 and is certainly

a higher level of planning than goes into many, more typical assaults. *See Coombs,* 823 F. App'x at 617 (affirming application of the enhancement even though "aggravated assault is not 'complicated criminal activity.' What matters is whether Coombs more than minimally planned his assault of M.C., not whether his offense was 'complicated.'"); *United States v. Sandoval*, 325 F. App'x 828, 830 (11th Cir. 2009) (unpublished) ("There was more than minimal planning [where] … substantial planning proceeded the drive-by-shooting of the rival members house [which was] more planning than would be involved in a 'simple form' drive-by-shooting").

**Four Level Upward Enhancement for Use of a Dangerous Weapon**

Guidelines Section 2A2.2(b)(2)(B) provides for a four-level increase in the offense level if a dangerous weapon was used. Application Note 1 states that "dangerous weapon" "has the meaning given that term in § 1B1.1, Application Note 1, and includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such instrument is involved in the offense with the intent to commit bodily injury." Section 1B1.1, Application Note 1, states that "'Dangerous weapon' means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (*e.g.* a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)."

Here, Alberts used the wooden pallet offensively against officers at the Northwest Steps. Contrary to his statements at trial, Alberts did not *solely* use the pallet as a shield. If he had, Alberts would have remained stationary at the base of the Northwest Steps like other individuals at that

34

location. *See* Government Image Exhibit 6 showing another rioter with the wooden pallet in a defensive position.



*Government Image 6*

Instead, Alberts used the wooden pallet as a battering ram against a line of police officers who were forced to retreat as Alberts charged towards them. *See* Government Trial Exhibits 308, 309, 413.

Other courts have found that police riot shields, wielded by January 6 defendants, can be considered "dangerous weapons" depending on how they were used, within the meaning of U.S.S.G. § 2A2.2(b)(2)(B). *See, e.g.,* in *United States v. McCaughey, III et al.*, 21-cr-40-TNM, Tr. 09/13/2022 at 23, 26). If that's the case, then a wooden pallet, which is larger and heavier than a police riot shield, used a makeshift battering ram, should, *a fortiori*, satisfy the requirements for the enhancement.

**Upward Variance**

The Government notes that its requested sentence of incarceration is within the applicable Guidelines range. To the extent the Court's determined combined offense level is lower than the Government's calculated level, the Government requests an upward variance to the Government's requested sentence of 120 months incarceration. While the Government ultimately seeks an upward variance from the applicable sentencing guidelines range due to several aggravating factors, the enumerated departures under the U.S. Sentencing Guidelines serve as guideposts for our request.

**Firearm in a Riot**

U.S.S.G. § 5K2.6 states, "[i]f a weapon or dangerous instrumentality was used *or possessed* in the commission of the offense the court may increase the sentence above the authorized guideline range." Here, Alberts possessed a loaded handgun (with a round of ammunition in the chamber) containing hollow point bullets and an extra magazine; he carried a total of 25 rounds of ammunition when he confronted officers and led the crowd up the stairs at the Capitol.

The background commentary under U.S.S.G. § 3D1.4 explains that there are circumstances for which the grouping analysis to determine the combined offense level for multiple groups "could produce adjustments for the additional counts that are inadequate." U.S.S.G. § 3D1.4, bkgd. Cmt. The commentary further indicates that "[s]ituations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines." *Id.*; *see also United States v. Pitts*, 973 F. Supp. 576, 582 (E.D. Va. 1997) (departing upward by two levels based on inadequacy of grouping when defendant had "two separate and distinct periods of espionage activity—one actual and one

36

attempted"), *aff'd*, 176 F.3d 239 (4th Cir. 1999); *United States v. Rowbal*, 105 F.3d 667 (table), 1996 WL 747911, at *2 (9th Cir. 1996) (unpublished) (affirming a two-level upward departure on the ground that the defendant's punishment, under the grouping rules, was not sufficiently increased). Alternatively, the Court could sentence Alberts to consecutive terms of imprisonment based on the separate and distinct conduct underlying Count Group 1 and Count Group 2. *See* U.S.S.G. § 5G1.2(d).

Alberts' *convictions* properly account for the possession of the firearm. *See, e.g.,* Counts 3, 4, 6, and 9. However, the draft PSR total Guidelines offense level of 28 reflects only Alberts' assault on police at the Northwest Steps. It does not reflect any additional increase in the combined offense level for Alberts' significantly aggravating possession of a concealed, loaded handgun or of Level-4 plated body armor. For that reason, if the Court decides not to apply a multiple count adjustment pursuant to U.S.S.G. § 3D1.4,[9] the government requests an upward variance under U.S.S.G. § 3D1.4, cmt. n.2 and U.S.S.G. § 5K2.6. The government would also note that even if the Court applied the multiple count adjustment under U.S.S.G. § 3D1.4, it would not account for Alberts' transportation and possession of a firearm in the District of Columbia without a valid license (notwithstanding the D.C. Code conviction, which would run concurrently under D.C. Voluntary Sentencing Guidelines[10]).

---

[9] *See* the government's Guidelines analysis, *supra*.

[10] *See* D.C. Sentencing Guidelines Chapter 6.2 ("The following sentences must be imposed concurrently: Offenses that are not crimes of violence (including misdemeanors): multiple offenses in a single event, such as passing several bad checks that are sentenced on the same day.").

To boot, Alberts' possession and actual use of body armor during his crimes is also not reflected in his current guidelines range. While the body-armor enhancement is only subject to those categorical crimes of violence (*See* U.S.S.G. 3B1.5(2)(B)), and a conviction for section 111(a) is not a crime of violence under federal law, it nevertheless provokes meaningful concern that Alberts' use of the body armor demonstrated his preparation and ability to execute violent acts.

All in all, Alberts' possession of a firearm in the middle of a riot and the use of body armor which assisted his crimes are worthy factors to consider in determining whether the guidelines range accurately captures the true nature of his conduct.

**Disrupting Congress**

Alberts was not charged with or convicted of obstructing a proceeding before Congress, in violation of 18 U.S.C. § 1512(c)(2). But evidence at trial showed that his criminal conduct substantially contributed to the disruption of the electoral certification. Pursuant to U.S.S.G. § 5K2.21, the Court may upwardly depart to reflect the seriousness of the offense based on conduct (1) underlying a potential charge not pursued in the case … *for any … reason*; and (2) *that did not enter into the determination of the applicable guideline range* (emphasis added).

Section 5K2.7 states that "[i]f the defendant's conduct resulted in a significant disruption of a government function" the sentencing court may depart upwards "to reflect the nature and extent of the disruption and the importance of the governmental function affected." *Id.* Here, the relevant governmental function—the certification of the Electoral College vote to determine the next President of the United States—was of the utmost importance.

If Alberts' conduct along with at least three other rioters had occurred on January 5 or January 7 or any other day, his combined offense level would have been the same as is currently calculated. Alberts chose to attend the Stop the Steal rally and then venture on to Capitol Grounds and through the Restricted Perimeter on January 6, 2021—the day of the electoral certification to determine the next President of the United States.[11] He exclaimed, "taking over the Capitol Patriots!" as he marched towards the U.S. Capitol Building. He ventured past bike racks and barricades and bulldozed through police lines—heightened security precautions that existed because of the electoral certification. This was no ordinary day and Alberts' sentence should reflect that fact.

Alberts' conduct at the Northwest steps, both individually and in conjunction with his fellow rioters, was also unique. Alberts was the first rioter to go hands on with a U.S. Capitol Police Officer at the Northwest Steps. Alberts was the first rioter to reach the Northwest Steps landing. Alberts, with his body armor, gas mask, military gear, and rage, rallied and instigated the mob. When the mob did eventually breach the police line, they flooded up the Northwest Steps, took the Upper West Terrace, occupied the Capitol Building, and delayed the electoral certification for hours.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[11] In a body-worn camera video recorded shortly after Alberts' arrest, Alberts stated to an MPD officer that "January 6 don't happen in the middle of April. It should have been over a few months ago." That recording will be provided to the Court upon request.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Alberts' felonious conduct on January 6, 2021 was part of a massive riot that delayed, and almost succeeded in preventing, the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and risking a constitutional crisis.

Alberts played a critical role in the attack on the Capitol. Due to his body armor and gas mask, Alberts was the first rioter to reach the Northwest Steps and go hands on with police. Alberts then encouraged thousands of other rioters to follow him up the Northwest Steps where they took the Upper West Terrace and eventually entered the U.S. Capitol Building. Alberts repeatedly made his intention clear – he stated that the police offices guarding the U.S. Capitol Building and our democracy were "domestic terrorists" and professed a desire to "wipe out" Congress, BLM, and Antifa. The entire time, Alberts was armed with a loaded 9-millimeter pistol with hollow point and high-pressure rounds and an extra magazine of ammunition. The nature and circumstances of Alberts' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 120 months.

### B.  Alberts' History and Characteristics

Since Alberts has only one prior conviction, for possession of marijuana in 2014, his criminal history score is zero and he has a criminal history category of I.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Alberts' criminal conduct on January 6 was the epitome of disrespect for the law.

His continued public statements that his conduct on January 6 was "heroic" and that he served as a "protector" on that day are belied by his crimes.

When Alberts entered the Capitol grounds, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the general public and to other rioters that attempts to obstruct official government proceedings and interfere with police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

General deterrence, that is, "the importance of deterring future malcontents disappointed with the outcome of an election from planning for and then disrupting the peaceful transition of power after an election … weighs very heavily[.]" *United States v. Mattice*, 21-cr-657 (BAH),

---

[12] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Sentencing Tr. at 70. It is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Alberts has expressed no remorse or contrition upon his arrest, through his numerous public statements since, and at trial. He remains proud of his conduct on January 6, 2021 and defiantly claims to be a "hero." In a public speech at the 1776 Restoration Rally and at least six podcast interviews, Alberts has shielded himself with his military service and false claims of patriotism. He claimed that his "trial is the fight for America."        https://player.fm/series/freedom-unchained/ep-17-hope-truth-bombs-cpac-chris-alberts at 50:45. He repeatedly sought support and financial donations to "make history for this country." *Id.* at 1:24. Alberts has also hidden behind the First Amendment, falsely arguing that his prosecution and conviction for his unlawful conduct somehow violates his speech rights.

Even on the eve of trial, Alberts showed no remorse for his actions and displayed his disdain for the Court proceedings by dancing in front of the D.C. Jail and soliciting donations with his attorney.[13] *See* Government Images 7, 8. His presence at the D.C. jail was in violation of the terms of his pretrial release.

---

[13] https://www.youtube.com/watch?v=zYLSv5hC3vY



*Government Image 7*



*Government Image 8*

Alberts also repeatedly slandered the officers of the Capitol Police, falsely stating that he

offered to provide lifesaving assistance to the late Officer B.S. when, in fact, Alberts was nowhere

43

near that officer.[14] Alberts stated, incorrectly, that "S[.]'s fellow officers let him die." https://player.fm/series/freedom-unchained/ep-17-hope-truth-bombs-cpac-chris-alberts at 22:39. Throughout his podcast interviews and as part of his trial strategy, Alberts cynically cast blame upon the courageous officers who guarded the Capitol Building on January 6, 2021, promoting himself and his fellow rioters as heroes as they attacked the Capitol and assaulted its defenders.

Through its sentence, the Court must send an unambiguous message to Alberts that military service does not justify his betrayal of the United States on January 6, 2021. His assault on USCP officers was inexcusable; he was decidedly not "an upstanding, law-abiding former combat veteran, on the same side as the officers." *See* ECF No. 167 at 2. Alberts' assault on USCP officers and attack on the Capitol was not heroic and he was no "protector" on that day. The Court's sentence should deter him from any similar wrongdoing.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

---

[14] Alberts likely observed an MPD officer who was feeling dizzy and was provided water as Alberts waited for transit to be booked. *See* ECF No. 106 at 9.

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district

courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when

warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail

'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[16]

---

[15] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[16] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

There are two cases that provide this Court the best comparison for sentencing and avoiding unwarranted disparities.

First, in *United States v. Thomas Webster*, 21-cr-208 (APM), the defendant, like Alberts, engaged in violence during the attack on the Capitol. Thomas Webster, too, was a former member of the armed forces and similarly agitated and riled up the crowd with his rhetoric and rage. Webster violently attacked a police officer on the Lower West Terrace while wearing body armor. Like Alberts, Webster did not express remorse for his actions and was convicted on all counts by a jury. Unlike Alberts, Webster was convicted of violating 18 U.S.C. § 111(b) for his use of a flagpole, a dangerous weapon. However, Webster did not commit an additional assault by throwing a bottle at officers or carry his firearm on Capitol Grounds. Webster also did not state his intention of "taking over the Capitol" prior to his assault or indicate his desire to "sweep this whole country and take them all out." Judge Mehta sentenced Webster to 120 months of incarceration.

In *United States v. Guy Reffitt*, 21-cr-32 (DLF), the defendant, standing *next* to Alberts, stood at the front of the mob's advance upon the police line at the top of the Northwest Steps while carrying a concealed firearm. Unlike Alberts, however, Reffitt did not physically attack any officers, provide materially false testimony under oath, and was not wearing body armor or a gas mask during the breach on the staircase. His presence on Capitol grounds was also shorter than

47

Alberts', as he was sidelined by pepper spray and deterred from proceeding further by the time of

Alberts' assault on the officers at 1:54 p.m. However, Reffitt engaged in obstructive acts after

January 6, 2021. Judge Friedrich sentenced Reffitt to 87 months of incarceration. The fact that

Alberts *actually* engaged in violence, unlawfully remained on restricted Capitol grounds for six

hours while menacing officers, and materially lied under oath, illustrates the need for a far greater

sentence than Reffitt.

## VII. RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose

restitution in a federal criminal case. Because a federal court possesses no "inherent authority to

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291

§ 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d

at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases

involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The

MVRA applies to certain offenses including those "in which an identifiable victim or victims has

suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence,"

§ 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud

or deceit," § 3663A(c)(1)(A)(ii). *See Fair,* 699 F.3d at 512 (citation omitted). Because Alberts was

convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[17]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount

---

[17]  Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Alberts to pay $2,000 in restitution for his convictions on Counts One through Nine. This amount fairly reflects Alberts' role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Alberts' convictions under Counts 1 through 6 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the draft PSR notes, Alberts has raised over $22,000 in an online fundraising campaign styled as a "Hope for a Hero." PSR ¶ 101. The website does not indicate the exact purpose of the fund. *Id.* Alberts should not be able to "capitalize" on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 120 months incarceration.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:

/s/ Shalin Nohria
Shalin Nohria
Assistant U.S. Attorney
Shalin.Nohria@usdoj.gov

/s/ Jordan A. Konig
JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Jordan.A.Konig@usdoj.gov