```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2
      - - - - - - - - - - - - - - x
3     THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
4                  Plaintiff,          1:21-cr-00026-CRC-1
                                        Wednesday, April 19, 2023
5     vs.                              3:12 p.m.

6     CHRISTOPHER ALBERTS,

7                  Defendant.
      - - - - - - - - - - - - - - x
8

9     _____

10                  TRANSCRIPT OF JURY TRIAL
         HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE
      _____
12    APPEARANCES:

13    For the United States:    JORDAN ANDREW KONIG, ESQ.
                                U.S. DEPARTMENT OF JUSTICE
14                              P.O. Box 55
                                Ben Franklin Station
15                              Washington, DC 20044
                                (202) 305-7917
16                              jordan.a.konig@usdoj.gov

17                              SAMUEL DALKE, ESQ.
                                DOJ-USAO
18                              228 Walnut Street, Suite 220
                                Harrisburg, PA 17101
19                              (717) 221-4453
                                samuel.s.dalke@usdoj.gov
20
                                SHALIN NOHRIA, ESQ.
21                              UNITED STATES ATTORNEY'S OFFICE
                                601 D Street NW
22                              Suite Office 6.713
                                Washington, DC 20001
23                              (202) 344-5763
                                shalin.nohria@usdoj.gov
24

25    (CONTINUED ON NEXT PAGE)
```

```
1     APPEARANCES (CONTINUED):

2     For the Defendant:          JOHN M. PIERCE, ESQ.
                                  ROGER ROOTS, ESQ.
3                                 JOHN PIERCE LAW P.C.
                                  21550 Oxnard Street
4                                 Suite 3rd Floor OMB #172
                                  Woodland Hills, CA 91367
5                                 (213) 400-0725
                                  jpierce@johnpiercelaw.com
6                                 rroots@johnpiercelaw.com

7
      Court Reporter:            Lisa A. Moreira, RDR, CRR
8                                Official Court Reporter
                                 U.S. Courthouse, Room 6718
9                                333 Constitution Avenue, NW
                                 Washington, DC  20001
10                               (202) 354-3187

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're back on
 3      the record for Criminal Case 21-26, United States of America
 4      vs. Christopher Alberts.
 5              THE COURT:  All right.  Good afternoon, everyone.
 6      Good to see you.
 7              We have received a note dated 2:22 from the jury,
 8      which, for the record, reads, "Regarding the definition of
 9      'assault' on Page 12 of the instructions, can someone
10      threaten to inflict injury by knowing that his actions will
11      make it easier for others to inflict injury?"
12              I think it is -- it's not the clearest note in the
13      world.  I mean, taking it at face value, someone cannot
14      commit an assault by simply knowing something, right?  You
15      need an act, and you need a state of mind.
16              What I suspect they're trying to convey is sort of
17      an aiding-and-abetting theory.  Can one commit an assault
18      through -- by aiding and abetting or threatening to aid and
19      abet others in committing an assault?
20              So I'm open to suggestions.
21              Mr. Konig.
22              MR. KONIG:  I just want to posit, sort of thinking
23      through it, I think that's one understanding of it, is that
24      they're asking about aiding and abetting.
25              It might also be a confusion because I'm not sure
```

1    that we defined "threatened," and it might be the jury does

2    not understand what "threatened" means.

3            But, you know, it isn't the clearest question in

4    the world, so that's just me sort of free-styling on what I

5    think of when I read that question.

6            THE COURT:  All right.

7            MR. ROOTS:  Yes, of course "assault" has, you

8    know, I don't know how many different ways, but I believe

9    the way that Mr. Alberts is accused, a threat is not

10   really -- does not really enter into it at all.  It's bodily

11   harm with the intent to have -- to commit -- to produce

12   injury or to commit another felony.

13           So threat -- now, to me, assault can be done with

14   a threat, which would be someone pointing a gun, for

15   example, at someone.  That is an assault by threat.

16           But in this case, Mr. Alberts, I don't believe, is

17   accused of assault by threat in any case.  It's physical

18   touching with the intent to harm or commit another felony.

19           So I think the jury is off the rails here a little

20   bit.  Maybe they're looking in the wrong direction.  I think

21   the easiest answer is the word "no."

22           THE COURT:  All right.  How would you suggest I

23   answer the note, Mr. Konig?

24           Mr. Dalke?

25           MR. DALKE:  And I'm just parsing through this as

1    well.  I think we're as -- as reflected by the comments of

2    my counsel that preceded me, we're still grappling and

3    trying to understand what the instruction means -- or what

4    the question means.  I apologize.

5         My inclination was it did relate to an aiding and

6    abetting.  That's what I think this comes down to.

7         We haven't defined that.  We haven't instructed on

8    that.  I think the response is not "no"; the response is the

9    aiding and abetting instruction.

10        I think that's what's going to lead the jury to --

11    that's the proper instruction.  It's properly included in

12    every count, including Count 2.  I think that's the

13    instruction, if we pulled it up from Red Book and what's

14    used in other cases.  That's what would give the appropriate

15    guidepost and answer the question.

16        I don't think, with the level of detail in this

17    question from the note from the jury, just saying "no" or

18    "yes" is going to give the appropriate guidepost.  I mean,

19    it could also relate to injury.  We had previously proposed

20    an instruction on injury.

21        But I really think it goes to -- at its essence it

22    is an aiding-and-abetting question.

23        THE COURT:  Mr. Dalke, while I think that that is

24    a natural interpretation of what the jury is asking, is the

25    government comfortable with providing an answer that may not

1    be technically responsive to the precise question that the

2    jury asked?  If you follow me?

3              Does the Court have leeway to fairly interpret the

4    question and answering that question, or is the Court bound

5    to answer the literal question that the jury asked?

6              MR. DALKE:  I think the Court is bound to answer

7    the question that's asked.  You know, but I do think the

8    question that's asked is an aiding-and-abetting question.

9              It may not be phrased --

10             THE COURT:  Well, that's what I mean.  The way the

11   question is phrased:  Can someone threaten to inflict injury

12   by knowing that his actions will make it easier for others

13   to inflict injury?

14             And I think the literal answer to that question

15   is:  Having a state of mind alone, unaccompanied by any act,

16   is not an assault.  You can't commit an assault simply by

17   knowing something, which I think is literally what the jury

18   is asking.

19             I'm not sure that that's what they meant, but

20   that's what's in front of me.  So that's the dilemma.

21             (Pause)

22             MR. DALKE:  And I'm not ignoring your question.

23             THE COURT:  No, I know.  Take your time.  Take

24   your time.

25             MR. DALKE:  I'm just taking a look at this.

1           (Pause)

2           THE COURT:  And that said, the note does refer to

3     actions, so maybe there is some play in that.  But I'm not

4     sure.

5           MR. ROOTS:  Your Honor, we don't see an aiding and

6     abetting -- any language in the indictment, so I think

7     that's -- I think Mr. Alberts is accused of individually

8     committing an assault, so I think this -- if we're going to

9     mislead them in that direction of an aiding-and-abetting

10    theory, that would be not as the indictment specifies.

11          And, again, there is a type of assault that

12    involves a threat, and that is where someone points a gun at

13    someone.  That's an assault.  But in this case, this is not

14    that type of theory of assault.

15          Mr. Alberts is accused of actual -- the physical

16    touching assault with the intent to commit -- to injure, and

17    they have this word "injury" in there.  But is -- the word

18    "threat" shouldn't play into that type of assault.

19          So I think the best answer is "no," that

20    Mr. Alberts is -- the evidence against him has to stand on

21    its own and not -- Mr. Alberts's state of mind regarding

22    what others would do is not --

23          THE COURT:  Right.  But if a perpetrator says to

24    the victim, "If you don't give me the money, I'm going to

25    call over my friend, and he's going to beat you to a pulp,"

1    that's a threat of an assault, and he's aiding and abetting

2    someone else to do it.  So the answer in that case would not

3    be no.

4           So I think one can threaten to commit an assault

5    by assisting others to do it, but that's not -- that may be

6    where the jury is focusing.  But my hang-up is I'm not sure

7    that those -- that that's not what it asked based on the

8    literal language of the note.

9           MR. ROOTS:  And we don't see "aiding and abetting"

10   in the indictment.

11          THE COURT:  That's a different issue.  Aiding and

12   abetting is a means of -- it's a theory of criminal

13   liability that is inherent in every criminal offense.

14          The government didn't proceed on an aiding and

15   abetting theory, but it is inherent as a theory of liability

16   in every criminal offense as far as I know.  You don't have

17   to separately charge aiding and abetting.

18          MR. ROOTS:  And of course there's evidence in the

19   trial of all kinds of other people doing other things, but I

20   don't believe the government ever even attempted to loop in

21   or connect Mr. Alberts to actions of others.  In fact, it's

22   very clear Alberts -- everything that the government accuses

23   him of doing was on his own, individualized.

24          So I think the plainest answer would be "no," that

25   in this -- you know, under the theory of assault in this

 1    case, that no, there can -- threatening to inflict injury by

 2    knowing that actions make it easier for others to inflict

 3    injury cannot be assault.

 4            MR. DALKE:  So, Your Honor, after giving it some

 5    more thought, I mean, in my mind, when I'm thinking through

 6    jury questions --

 7            THE COURT:  This is not an easy note.

 8            MR. DALKE:  -- it's not to be -- correct.  And

 9    when I'm thinking through this, either the answer "yes" or

10    the answer "no," neither of those is correct.  So I don't

11    think this is a situation where we can plainly just go back

12    "yes" or "no."  I think it needs some explanation.

13            I think it may just be we reread the instructions

14    as it is.  It may be we reread the instructions as they are

15    with the additional aiding and abetting or go a little

16    further with more clarification.  But I don't think it's

17    proper in this circumstance, given the way the question is

18    phrased, to go back either "yes" or "no" because --

19            THE COURT:  Because we don't know what is --

20    they're really --

21            MR. DALKE:  Because depending on what it is,

22    either can be correct.

23            THE COURT:  Here's what I'd think I'd like to do,

24    and I'll give you an opportunity to respond to it.

25            Because they don't really squarely tee up aiding

```
 1    and abetting, although I think that that's what's on their

 2    mind, what I could say is the following:  To commit an

 3    assault, the defendant must commit an act or attempt to

 4    commit an act or threaten to commit an act with the intent

 5    of inflicting or threatening injury.  Having a state of mind

 6    alone, unaccompanied by any act, is not an assault.

 7            Now, that may not answer their real question, in

 8    which case they can send out a follow-up note, but at least

 9    that addresses the notion that in order for there to be an

10    assault there needs to be an act and there needs to be the

11    requisite intent.  And that might get us halfway there; and

12    if they want more information, they can send out another

13    note.

14            MR. ROOTS:  I believe under the theory --

15            THE COURT:  And that's better -- instead of just

16    saying "yes" or "no," that at least conveys what we're all

17    thinking, you know.

18            MR. ROOTS:  I don't think threatening is involved

19    in the way that Mr. Alberts is accused.

20            THE COURT:  Well, the jury instructions include

21    threat, and the jury asked about threat, so I'm going to

22    include threat.  The instruction says, "The term 'assault'

23    means any intentional attempt or threat to inflict injury

24    upon someone else," so that's already there.

25            MR. DALKE:  Your Honor, I think under the
```

1    circumstances, the note -- we can't come up with a better

2    alternative to what's been --

3            THE COURT:  Okay.  I will do that.

4            Mr. Roots, do you want to object?  You can object

5    to it, if you'd like, but I think that's an accurate state

6    of -- I think it's right, and I think it is literally

7    responsive to the note that they sent.

8            MR. ROOTS:  We don't object, but we -- maybe a

9    statement of -- that the instructions, as given that, you

10   know, fairly -- you know, I don't know.

11           I guess we don't really have much of an objection

12   to that proposal.

13           THE COURT:  Okay.  Why don't we do that, at least

14   as a stop gap, and we'll see if they inquire further.

15           Meanwhile, we have just received yet another note,

16   which I will read to you.

17           I guess in the meantime, Ms. Higgins, if we could

18   put that language under the caption -- the case caption and

19   the heading "Response to Jury Note of 2:22."  Let's at least

20   get that started.

21           (Pause)

22           MR. ROOTS:  Your Honor, I don't know if you're

23   ready to discuss the second note.

24           THE COURT:  Sure.  As to Question 1, I assume the

25   answer's yes.

1        MR. ROOTS:  Yes, from our perspective.

2        Question 2, I want to say that I have done some

3    research on this question, and there is, you know, mostly

4    state case law on this, but there is a lot of case law on

5    this, and "bodily harm" and "injury" do require a level of

6    injury that is like the breaking of -- the intent to do a

7    level of injury that is -- and I think there's case law in

8    many states.  California has a lot -- a level of injury that

9    is like hospitalization, a broken bone, serious injury; not,

10   you know, a pain, not a -- not just a momentary-pain-type

11   injury.

12       And we could brief that, you know, if we had time.

13   But I have briefed it in the past for other cases, and I do

14   believe that there's a lot of case law that says the injury

15   require -- the intent -- there is no injury that's required

16   to be convicted of assault, but there has to be the intent

17   to cause injury of a level that would incapacitate someone,

18   you know, temporarily.  Some injury, broken bone, flesh

19   wound of some kind, not just a -- not just pressing of the

20   flesh.

21       THE COURT:  Okay.  Mr. Dalke, is there a Red Book

22   definition of bodily harm --

23       MR. NOHRIA:  There is --

24       THE COURT:  -- in D.C. or a D.C. case that --

25       MR. NOHRIA:  There is a D.C. criminal jury

1    instruction that defines "injury," and it says, "'Injury'

2    means any physical injury, however small, including a

3    touching offensive to a person of reasonable sensibility."

4    And that would be the -- that would be the instruction we

5    would be requesting.

6         THE COURT:  But they're not asking -- the element

7    is not injury.  It's bodily harm.  Is "injury" and "bodily

8    harm" synonymous?  Are "injury" and "bodily harm"

9    synonymous?

10        MR. NOHRIA:  One moment, Your Honor.

11        THE COURT:  Because you can injure property,

12   right?

13        MR. ROOTS:  I would say we are actually dealing

14   with another case right now where another January 6th

15   defendant is accused of assault -- I think five counts of

16   assault -- essentially for elbowing police officers who were

17   holding shields.  And so I have -- we've done some research

18   on that, and it does require more than just pushing.  It

19   requires an intent to, you know -- well, this isn't an

20   assault charge.  It's engaging in physical violence, which

21   is 1752(a)(4).

22        MR. NOHRIA:  And, Your Honor, I would only note

23   that --

24        THE COURT:  I'm sorry, Mr. Roots, if one of your

25   other cases involves that statute, and if there are

1    instructions that Courts have given on bodily harm, I would

2    be more than happy to consider them.  But it's -- I think

3    this is different than "assault," and it's different than

4    "injury."

5         Go ahead, Mr. Nohria.

6         MR. NOHRIA:  No, Your Honor, I was only going to

7    note that at least for the D.C. jury instruction on assault,

8    in the actual elements they're referencing injury, and then

9    in the sort of notes they are referencing a fear of

10   immediate bodily harm.  And so it seems to be that they are

11   sort of conflating and equating the two to a certain degree.

12        THE COURT:  All right.  And that's the Red Book

13   instruction on the definition of "injury"?

14        MR. NOHRIA:  Yes, Your Honor.

15        THE COURT:  Okay.

16        MR. NOHRIA:  And, Your Honor, the government would

17   agree on Question 1, that the definition used on Page 12

18   should be equated to the definition on Page 18 for

19   "assault."

20        THE COURT:  All right.  What I'm going to do is

21   I'm going to answer Question 1, but I'm not convinced that

22   we've had time to look into whether the definition of

23   "bodily harm" is synonymous with the definition of "injury"

24   for purposes of D.C. criminal law.  That -- I haven't looked

25   at the instruction, obviously, but just because the

1    instruction on injury references bodily harm in a

2    footnote -- or, I'm sorry, how does it reference bodily

3    harm?

4              MR. NOHRIA:  One moment, Your Honor.

5              Yes, it says, "The following definitions apply to

6    both Part A and Part B," and then in Part A is what had

7    referred to "injury."

8              And it says, "To prove that Name of Defendant had

9    the present ability to injure the complainant, the

10   government need not prove the complainant actually

11   experienced fear of injury.  It is sufficient to prove that

12   the defendant's act would have created in a reasonable

13   person of reasonable sensibility a fear of immediate bodily

14   harm."

15             THE COURT:  So what legal conclusion do you draw

16   from that?

17             MR. NOHRIA:  Well, in the first sentence it's

18   saying --

19             THE COURT:  That the two terms are synonymous?

20             MR. NOHRIA:  At least in this sense they seem to

21   be because they're referencing in the first sentence the

22   apparent present ability to injure, and then in the second

23   sentence they're referencing a fear of immediate bodily

24   harm.

25             THE COURT:  Okay.  Let us -- I'm going to go back

1    and see if I can -- I'll look that up and see if we can

2    locate any other -- any other authority.  And I'll come back

3    out before I instruct on the second question.

4            But we'll send back "yes" for Question 1.  Okay?

5    All right.

6            (Recess taken)

7            THE COURT:  All right.  We've noodled over this a

8    little bit and have done some research on the fly.

9            Okay.  So with respect to the third question

10   within Question 2, "Can 'bodily harm' include something

11   other than bodily injury?" I think our conclusion is that

12   "bodily harm" and "bodily injury" mean the same thing, are

13   synonyms with one another.  We found no definitions of

14   "bodily harm" in the federal criminal code, but there are

15   definitions of "bodily injury," which I think is synonymous

16   with "bodily harm."

17           Section 1752(a)(4), which is the statute at issue

18   here, includes a penalty enhancement for violations that

19   cause significant bodily harm, and it cross-references 18

20   USC 2118(e)(3) for a definition of "significant bodily

21   harm."  And just for the record, the cross-referenced

22   definition of "significant bodily harm" means "bodily

23   injury, which involves a risk of death, significant physical

24   pain, protracted and obvious disfigurement or a protracted

25   loss or impairment of the function of a bodily member,

1    organ, or mental or sensory faculty."

2    And that's sort of more in line with the

3    definitions that Mr. Roots discussed.  But, again, that is

4    "significant bodily harm," which is the penalty enhancement,

5    which is not what the government is seeking in this case, as

6    I understand it.

7    Is that fair?

8    MR. DALKE:  That's correct, Your Honor.

9    THE COURT:  Okay.  1752(a)(4) does not include a

10   definition or cross-reference a definition of "bodily harm,"

11   but we found numerous federal statutes that define "bodily

12   injury," including 18 USC 1365(h)(4), which is tampering

13   with consumer products; 18 USC 1864, hazardous or injurious

14   devices on federal lands; 18 USC 43, forced violence and

15   threats involving animal enterprises.  And there may be a

16   number of others, but they all incorporate the same

17   definition of "bodily injury," which can be found in 18 USC

18   1365.

19   The term "bodily injury" means a cut, abrasion,

20   bruise, burn or disfigurement, physical pain, illness,

21   impairment of the function of a bodily member, organ, or

22   mental faculty or any other injury to the body no matter how

23   temporary.  And so that's the definition that we see coming

24   up over and again in numerous federal statutes.

25   As the government noted before the break, the Red

1     Book definition of "injury" is any physical injury, however

2     small, including a touching offensive to a person of

3     reasonable sensibility.

4           Since we're dealing with the federal statute here

5     and not a common law assault or physical injury context, I

6     would propose that I give the definition of "bodily injury"

7     that appears most frequently in the federal code.

8           MR. NOHRIA:  Your Honor, that makes sense for the

9     government with respect to Count 5.

10          We would want to specify, I think, to avoid,

11    essentially, jury confusion regarding that as to the

12    difference between "injury" in Count 2, which I think we can

13    use the definition that the government had proposed, a

14    touching offensive to a person, with the difference between

15    Count 5 where it's bodily injury, and that definition that

16    the Court proposed would essentially come into play.

17          THE COURT:  Mr. Roots?

18          MR. ROOTS:  I agree with Your Honor's definition

19    for both.  I don't believe a mere touching can be sufficient

20    for either of those counts.

21          THE COURT:  Okay.  So the jury is focused on a

22    very particular term in Count 5 on Page 18, so I think I'm

23    just going to limit the definition of "bodily harm" as I

24    just read --

25          MR. NOHRIA:  And, Your Honor --

1          THE COURT:  -- in terms of what is the range of

2    harm that could be included in the definition.  I think

3    that's up to them to decide.

4          MR. NOHRIA:  Your Honor, the government would only

5    note that the jury has repeatedly focused on assault, the

6    language "assault," the word "assault," on Pages 12 and 18.

7          THE COURT:  Okay.

8          MR. NOHRIA:  And so I think that there is -- given

9    that there's a small difference, injury, bodily injury, we

10   don't want them imputing the definition of "bodily injury"

11   to then Page 12 for the Count 2 assault charge.

12          And so I think it does make sense to essentially

13   say:  Hey, for Count 2, here's the definition of "injury"

14   that you should be applying.  For Count 5, which you

15   specifically asked for, here's the definition of "bodily

16   harm," which equals bodily injury, and here's the definition

17   for that.  Because otherwise there's a substantial risk that

18   they'll apply that definition across the board.

19          THE COURT:  So what I would propose doing is just

20   focusing the response saying, "For purposes of Count 5, the

21   definition of 'bodily harm' is," and then just including

22   that definition for "bodily injury," not mentioning the word

23   "injury" in the response.

24          MR. NOHRIA:  Understood, Your Honor.  Then we

25   would only request that it specify "only," "for the purposes

1    of Count 5 only."

2          THE COURT:  Okay.  Let me play with that, and --

3    but I get your point.

4          All right.  Mr. Roots, anything else?

5          MR. ROOTS:  Well, I was just listening to what he

6    said, and I would -- I'm thinking of -- you know, that

7    phrase "disorderly conduct" frequently in the definitions

8    has the word "jostling."  When you look up "jostling," it

9    could mean violent elbowing or elbowing.  So I think that's

10   the pettiest misdemeanor known to the law, so it couldn't be

11   a felony to jostle.  That's disorderly -- and that

12   definition appears in the "disorderly conduct" counts.

13         So what they're suggesting is that mere jostling

14   can be a felony assault, and I don't believe that's the law.

15         THE COURT:  Okay.  I'm not sure that's responsive

16   to the jury's note.  We're not dealing with that

17   instruction, but so noted.

18         All right.  Thanks.

19         (Recess taken)

20         THE COURT:  All right.  So the jury has sent out a

21   note saying that it has reached a verdict.

22         (Jury enters courtroom)

23         THE COURT:  Okay.  Please be seated.

24         Juror No. 10, I understand that you are our

25   foreperson; is that correct?

1          THE FOREPERSON:  Yes, I am.

2          THE COURT:  And has the jury reached a verdict?

3          THE FOREPERSON:  Yes, we have.

4          THE COURT:  And is your verdict unanimous?

5          THE FOREPERSON:  Yes, it is.

6          THE COURT:  If you could hand the verdict form to

7     Ms. Jenkins, and I will inspect it.

8          (Pause)

9          THE COURT:  Okay.  Ma'am, if you could please

10    stand.  With respect to Count 1, civil disorder, how does

11    the jury find?

12         THE FOREPERSON:  Guilty, Your Honor.

13         THE COURT:  As to Count 2, how does the jury find?

14         THE FOREPERSON:  Guilty.

15         THE COURT:  As to Count 3, entering or remaining

16    in a restricted building or grounds with a deadly or

17    dangerous weapon, how does the jury find?

18         THE FOREPERSON:  Guilty.

19         THE COURT:  With respect to Count 4, disorderly or

20    disruptive conduct in a restricted building or grounds with

21    a deadly or dangerous weapon or firearm, how does the jury

22    find?

23         THE FOREPERSON:  Guilty.

24         THE COURT:  With respect to Count 5, engaging in

25    physical violence in a restricted building or grounds, how

```
1   does the jury find?
2              THE FOREPERSON:  Guilty.
3              THE COURT:  On Count 6, unlawful possession of a
4   firearm on Capitol grounds, how does the jury find?
5              THE FOREPERSON:  Guilty.
6              THE COURT:  On Count 7, disorderly conduct in a
7   Capitol building or grounds, how does the jury find?
8              THE FOREPERSON:  Guilty.
9              THE COURT:  Count 8, act of physical violence on
10  Capitol grounds, how does the jury find?
11             THE FOREPERSON:  Guilty.
12             THE COURT:  And finally, Count 9, carrying a
13  pistol without a license outside the home, how does the jury
14  find?
15             THE FOREPERSON:  Guilty.
16             THE COURT:  Mr. Pierce, poll the jury?
17             MR. PIERCE:  Yes, Your Honor.
18             THE COURT:  Okay.  Juror No. 1, is that your
19  verdict?
20             JUROR NO. 1:  Yes.
21             THE COURT:  Juror No. 2, is that your verdict?
22             JUROR NO. 2:  Yes.
23             THE COURT:  Juror No. 3?
24             JUROR NO. 3:  Yes.
25             THE COURT:  Juror No. 5, is that your verdict?
```

```
 1                  JUROR NO. 5:  Yes.

 2                  THE COURT:  Juror No. 7, is that your verdict?

 3                  JUROR NO. 7:  Yes.

 4                  THE COURT:  Juror No. 8, is that your verdict?

 5                  JUROR NO. 8:  Yes.

 6                  THE COURT:  Juror No. 9, is that your verdict?

 7                  JUROR NO. 9:  Yes.

 8                  THE COURT:  Madam Foreperson, is that your

 9      verdict?

10                  THE FOREPERSON:  Yes.

11                  THE COURT:  Juror No. 11, is that your verdict?

12                  JUROR NO. 11:  Yes.

13                  THE COURT:  Juror No. 12?

14                  JUROR NO. 12:  Yes.

15                  THE COURT:  Juror No. 13, is that your verdict?

16                  JUROR NO. 13:  Yes.

17                  THE COURT:  Juror No. 14, is that your verdict?

18                  JUROR NO. 14:  Yes.

19                  THE COURT:  Okay.  Thank you, ladies and

20      gentlemen.

21                  Ms. Jenkins, if the verdict can be recorded.

22                  Ladies and gentlemen, you are discharged.  Thank

23      you very much for your patience and for your service.  It's

24      my practice to personally thank all of my juries.  I will be

25      back in the jury room in about two or three minutes.  It
```

1    will take me -- we have a few housekeeping matters to attend

2    to.  Feel free to stay, if you'd like.  Otherwise, you are

3    free to go.

4            All right.  Thank you.

5            (Jury exits courtroom)

6            THE COURT:  Okay.  Please be seated.

7            Mr. Roots, Mr. Pierce, renewal of any post-trial

8    motions within the rules.  I think you have 14 days, all

9    right, unless you move for an extension.

10           Is the government seeking release pending

11   sentencing or detention pending sentencing?

12           MR. DALKE:  Could I briefly address the Court on

13   that issue?

14           THE COURT:  Sure.

15           MR. DALKE:  Your Honor, the government is seeking

16   to step back the defendant today at this time.  He's

17   unrepentant.  There's no remorse.  There's no understanding

18   of his outsized role in January 6th.  He's facing over five

19   years in prison, possibly more.

20           He came to the Capitol prepared.  He didn't come

21   for camping.  He came for a siege.  And at a critical point,

22   with tens of thousands at his back, he was the one who paved

23   the path forward for an insurrection.  He used that pallet

24   as a battering ram.

25           He's now been convicted on nine counts, including

1     multiple felonies, and notwithstanding the law,

2     notwithstanding the law, the defendant believes he can bring

3     a firearm to the Capitol.  He believes that he can charge

4     and assault officers.  He believes that his own beliefs are

5     above the law, that his own beliefs are above the

6     Constitution.

7           Guy Reffitt, the man is blue which we heard

8     testimony about, the man that the defendant took over from

9     on those same steps, he was sentenced to over seven years in

10    prison.

11          There's been others, including Riley Williams --

12    I'm personally involved in that case -- who have been

13    stepped back post-trial, post-conviction on 111(a) and 231

14    charges.  No 1512, 111(a), 231, the same as the defendant.

15    They've been stepped back post-conviction because the

16    circumstances facing the defendant now are significantly

17    different than they were previously.

18          He wasn't detained initially, but initially his

19    only charges related to having the firearm on Capitol

20    grounds.  Right?  Because he was arrested on January 6th,

21    the government and the FBI yet didn't know of that outsized

22    role, of all the other things he was involved in on January

23    6th.  So he wasn't detained as a normal person would be just

24    for having that initial offense.

25          Now that we know everything else that he's done,

1    everything else he's been part of, now that he's been

2    convicted of those offenses, I think the circumstances

3    changed.

4              Just last week he was outside the D.C. Jail

5    dancing.  I think that's probably a violation of his

6    pretrial supervision conditions, but, again, it goes back to

7    unrepentant, no remorse, no understanding of his role, no

8    understanding of what's going on here and what's at stake.

9    He's been on a handful of podcasts attending and speaking at

10   other rallies regarding this.

11             And, again, I say that not because he doesn't have

12   the right to speak at those rallies, but because it shows

13   his state of mind, the lack of recognition of the harm he

14   caused to those men, to the women, to the country, to what's

15   at stake.  And, you know, I don't think, given where he sits

16   today and what he faces now over the next couple of months,

17   that putting him -- releasing him or continuing to release

18   him on the same conditions is appropriate.

19             I think he should be stepped back, and it should

20   be today.

21             THE COURT:  Mr. Roots?  Mr. Pierce?

22             MR. ROOTS:  First, let me address this claim that

23   he was at the D.C. Jail dancing.  I was there with him.  I'm

24   his attorney.  We were actually there -- there's a nightly

25   vigil at the jail for J6ers.  It's a prayer vigil.

1          Mr. Alberts -- I was there with him, and we were

2     there in part to meet with witnesses, including Mr. Hiller,

3     who was also there.

4          So he was a legal -- he is within -- I believe his

5     conditions are that he be away from D.C. except in terms of

6     meeting with his attorneys.  It was a meeting with his

7     attorney.  I was there with him.  We were meeting with

8     Mr. Hiller as a prospective witness at that time, and at

9     that time we were discussing with Mr. Hiller -- and by the

10     way, I should say other potential --

11          THE COURT:  Why don't you address other defendants

12     who have been stepped back for similar --

13          MR. ROOTS:  I think they only named two that had

14     the similar charges.  Now, the others were 1512, which is up

15     to a 20-year sentence.  So I believe there's only been --

16     they only mentioned two.  If there are any more, I'd like to

17     know.  I think there have only been two held back pending

18     sentencing on these specific types of charges.

19          They said he's in a guideline range I think five

20     years.  That is -- I could be wrong.  I could be wrong.  But

21     I believe that those that have been previously held pending

22     sentencing were facing higher guideline ranges.

23          I could be wrong, and I would stand to be

24     corrected, if I am.

25          Mr. Alberts has been gainfully employed

1    constantly.  Even when his tow truck driver status became

2    problematic in part because of his charges, he has held

3    employment steadily as a flagger, traffic, with -- flag man

4    with traffic construction.  His employers, by the way, will

5    all speak very, very well of him.

6            He has a fiance.

7            He, by the way, has never had an issue with

8    compliance with his ankle monitor.  He's had an ankle

9    monitor this entire time.

10            I don't think I've ever seen any pretrial

11    defendant who has such a perfect record, and I submit he's

12    had a pretty perfect record.  He has never gone out of

13    boundaries without, you know, alerting probation.  He has

14    come to D.C. to meet with us, his legal team.

15            Again, he is engaged to be married.

16            With Guy Reffitt, I believe there were -- I

17    believe he was convicted of 1512, so that was a different

18    situation.

19            I don't believe he's had so much as a single

20    strike on him in the two years he's been released with

21    ankle monitor.  He's not a flight risk.  He's well known in

22    his community.  He's a volunteer firefighter.  He's a

23    volunteer -- he has been nothing but a pillar of his

24    community in terms of his civil engagement.

25            I don't believe the government has ever even put

1    on anyone that says he's a danger.  The only danger that

2    they have mentioned would be what we know of and what

3    they've talked about in this trial; in other words, the

4    claims that he was convicted of right now.

5              THE COURT:  Okay.  I've heard enough.

6              MR. DALKE:  And we do have the video, if Your

7    Honor cares to see it.  I don't want to press the point --

8              THE COURT:  I don't doubt what you say.

9              I'm going to deny the government's motion.  The

10   defendant will remain released pending sentencing consistent

11   with the same conditions that he has been under.

12             Yes?

13             MR. KONIG:  May I speak to the conditions he's

14   been under, Your Honor?

15             THE COURT:  Yes, why don't you do that now.

16             MR. KONIG:  I want to note that Mr. Alberts is one

17   of the first people arrested, and so his travel conditions

18   are essentially stay away from D.C., and his ankle monitor,

19   if the Court remembers --

20             THE COURT:  Tell you what, why doesn't the

21   government submit a motion for change of conditions in light

22   of the present context, and the Court will consider those.

23             MR. KONIG:  We will.  Thank you, Your Honor.

24             THE COURT:  Okay.  But the Court makes a finding

25   by clear and convincing evidence that the defendant is not a

1      risk of flight or a danger to the community notwithstanding

2      the convictions.  This is not to minimize at all the

3      seriousness of the conduct or the charges with which he has

4      now been convicted or the potential time that he is facing.

5              But the defendant has no prior criminal record.

6      He has not violated any conditions of release in the two

7      years.  He is gainfully employed.  He has a family network.

8      And while the offense of conviction includes infliction of

9      physical violence, the level of physical violence in this

10     case is, let's just say, less than some others in January

11     6th, and no property destruction either.

12             So for all of those reasons, the Court will allow

13     Mr. Alberts to remain on release until at least sentencing.

14     Okay?

15             And, Mr. Alberts, needless to say, it would not be

16     a wise decision in the least for you not to appear at your

17     sentencing.  I'm sure you understand that.

18             THE DEFENDANT:  I will be here, Your Honor.

19             THE COURT:  Sentencing, Counsel?  July 19th?

20             It takes about -- Mr. Alberts, the next thing that

21     will happen is that the probation office will prepare a

22     complete presentence investigation report.  They will seek

23     to interview you.  They may seek to interview your family

24     members.

25             That is a very comprehensive report.  It will go

1    over your personal history, your employment history, your

2    educational history, your medical history, any criminal

3    history that we don't know about, and that will be the

4    primary thing -- including memos that will be submitted by

5    both sides with recommendations, that will be the primary

6    thing I will consider in deciding what an appropriate

7    sentence is in this case.  So it's important that you

8    cooperate with probation fully so that I have as good as a

9    picture of you as I can.

10            That process usually takes at least a couple of

11   months, so we've been setting sentencings out about three

12   months.

13            Does that work for the government, July 19th?

14            MR. KONIG:  Yes, Your Honor.

15            THE COURT:  Mr. Pierce?

16            MR. PIERCE:  Yes, Your Honor.

17            THE COURT:  All right.  The Court will set

18   sentencing in this matter for July 19th at 10:00 a.m.

19   obviously here in the courtroom.

20            THE DEFENDANT:  Your Honor, I have a quick

21   question.  I just wanted to know if it was going to be D.C.

22   or Maryland?  Like who should I be looking to call me --

23            THE COURT:  The probation office will contact your

24   counsel.  Okay?

25            THE DEFENDANT:  Yes, sir.

1          THE COURT:  And it will likely be a probation

2     officer from Washington.

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Anything else, Counsel?

5          MR. DALKE:  No, Your Honor.  Thank you.

6          THE COURT:  All right.  We'll stand in recess.

7               (Whereupon the hearing was

8                concluded at 5:32 p.m.)

9

10          **CERTIFICATE OF OFFICIAL COURT REPORTER**

11

12          I, LISA A. MOREIRA, RDR, CRR, do hereby

13     certify that the above and foregoing constitutes a true and

14     accurate transcript of my stenographic notes and is a full,

15     true and complete transcript of the proceedings to the best

16     of my ability.

17       Dated this 14th day of September, 2023.

18

19                              /s/Lisa A. Moreira, RDR, CRR

20                              Official Court Reporter
                               United States Courthouse
21                              Room 6718
                               333 Constitution Avenue, NW
22                              Washington, DC 20001

23

24

25