```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2     - - - - - - - - - - - - - - - x
       THE UNITED STATES OF AMERICA,
 3                                      Criminal Action No.
                    Plaintiff,          1:21-cr-00026-CRC-1
 4                                      Wednesday, July 19 2023
       vs.                              10:08 a.m.
 5
       CHRISTOPHER ALBERTS,
 6
                    Defendant.
 7     - - - - - - - - - - - - - - - x
       _____
 8
                 TRANSCRIPT OF SENTENCING HEARING
 9       HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                  UNITED STATES DISTRICT JUDGE
10     _____
       APPEARANCES:
11     For the United States:      JORDAN ANDREW KONIG, ESQ.
                                   U.S. DEPARTMENT OF JUSTICE
12                                 P.O. Box 55
                                   Ben Franklin Station
13                                 Washington, DC 20044
                                   (202) 305-7917
14
                                   SHALIN NOHRIA, ESQ.
15                                 UNITED STATES ATTORNEY'S OFFICE
                                   601 D Street NW
16                                 Suite Office 6.713
                                   Washington, DC 20001
17                                 (202) 344-5763

18     For the Defendant:         JOHN M. PIERCE, ESQ.
                                   ROGER ROOTS, ESQ.
19                                 JOHN PIERCE LAW P.C.
                                   21550 Oxnard Street
20                                 Suite 3rd Floor OMB #172
                                   Woodland Hills, CA 91367
21                                 (213) 400-0725

22     Court Reporter:            Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
23                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
24                                 Washington, DC  20001
                                   (202) 354-3187
25
```

```
 1                     P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we're on the
 3    record for Criminal Case 21-26, United States of America vs.
 4    Christopher Alberts.
 5            Counsel, please approach the lectern and identify
 6    yourselves for the record starting with the government.
 7            MR. NOHRIA:  Shalin Nohria on behalf of the United
 8    States, along with Jordan Konig.
 9            THE COURT:  Mr. Nohria, how are you?
10            MR. PIERCE:  Good morning, Your Honor; John Pierce
11    on behalf of defendant, Christopher Alberts, along with co-
12    counsel, Roger Roots.
13            THE COURT:  Okay.  Good morning, Mr. Pierce.
14            Good morning, gentlemen.
15            All right.  We are here for the defendant's
16    sentencing hearing.  This is not my normal courtroom.
17    Everything is on the wrong side.  So if I walk the wrong
18    way, you will know why.
19            All right.  The Court has read all of the
20    documents:  the presentence investigation report, the
21    memoranda that were submitted by both sides, including the
22    supplemental filing received from the defense attaching
23    three pages of medical records, as well as the victim impact
24    statement that was filed, I believe, this morning under seal
25    by the government.  That statement was offered by one of the
```

1    police officers that Mr. Alberts encountered at the top of

2    the northwest stairs.

3         The Court's also reviewed the videos submitted by

4    the government, and you should feel free to display any of

5    those in court that you see fit.

6         I've not received any letters on Mr. Alberts's

7    behalf.  Is that correct, Mr. Pierce?

8         MR. ROOTS:  I don't believe we've filed letters

9    for this sentencing, but Mr. Alberts did have a bunch of

10   letters of support earlier in the case for his bond hearings

11   and things like that.

12        THE COURT:  Okay.  Well, if there were letters

13   submitted earlier in the case, I'm sure that I read them.

14        Any other written materials for the Court's

15   consideration?

16        MR. NOHRIA:  Not from the government, Your Honor.

17        MR. ROOTS:  Not from the defense.

18        THE COURT:  Okay.  Mr. Roots, any guests or family

19   members that you'd like to acknowledge?

20        MR. ROOTS:  Yes.  Mr. Alberts has his fiance and

21   his sisters and brothers here.

22        THE COURT:  Okay.

23        MR. ROOTS:  And I don't know yet if they want to

24   speak at all.  We'll discuss that, if we have a break.

25        THE COURT:  Okay.

```
1              All right.  Starting with the factual findings in

2      the presentence investigation report, there were a number of

3      objections by the defense to the characterization of the

4      facts in the report.  Those objections will be part of the

5      record.

6              The Court obviously sat through the trial, and I

7      find for the most part that the characterizations by

8      probation are fair and are consistent with what the jury

9      found beyond a reasonable doubt.

10             The Court issued a ruling yesterday, I believe, on

11     the defendant's post-trial motions for judgment of acquittal

12     and a new trial.  The Court laid out some of the factual

13     findings there from its perspective.

14             Perhaps the largest factual dispute centers around

15     how Mr. Alberts used the wooden pallet at the top of the

16     stairs; as a battering ram, as the government characterizes

17     it, or as a defensive shield, as the defense continues to

18     insist.  The Court will get to that in connection with the

19     enhancement that is premised on that conduct.  All right?

20             All right.  Mr. Alberts, have Mr. Roots and

21     Mr. Pierce reviewed the presentence investigation report

22     with you?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  And have you been satisfied with their

25     services thus far in the case?
```

 1          THE DEFENDANT:  Yes, Your Honor.

 2          THE COURT:  All right.  With that, the Court will

 3     accept the factual findings in the presentence investigation

 4     report regarding the circumstances of the offense; and,

 5     therefore, those facts, as stated in the PSR, will be

 6     adopted by the Court for purposes of sentencing.  And,

 7     again, the defense's objections will be noted for the

 8     record.

 9          All right.  There are a number of disputes

10     regarding the guidelines calculation.  What I'd like to do

11     is just to march down probation's findings.  And Ms. Field

12     from probation is here, and I may get her to weigh in on

13     some of those calculations.

14          But in any event, I'd like to march down, and then

15     I can hear argument on each one of the contested

16     enhancements or suggestions as we go along.

17          All right.  Just for the record, there were nine

18     counts of convictions.  Six of them are subject to the

19     Federal Sentencing Guidelines.  Count 7 for disorderly

20     conduct and Count 8 for an act of physical violence on

21     Capitol grounds are Class B misdemeanors, so they are not

22     subject to the guidelines, nor is Count 9, which is a D.C.

23     Code carrying a pistol without a license offense.

24          Under 3D1.2(b), the probation office grouped

25     Counts 1, for civil disorder, and 2, for assaulting or

 1     impeding certain law enforcement officers, and Count 5,

 2     physical violence in a restricted building or grounds,

 3     because all those offenses involve the same victims, namely

 4     United States Capitol Police and Metropolitan Police

 5     officers, and involved multiple related acts on the part of

 6     the defendant.

 7             Probation also grouped on the same basis Count 3,

 8     for entering or remaining in a restricted building or

 9     grounds with a deadly or dangerous weapon; Count 4,

10     disorderly conduct in a restricted building with a deadly or

11     dangerous weapon; and Count 6, unlawful possession of a

12     firearm on Capitol grounds.  Notably, however, the victim

13     for the Group 2 offenses, according to probation, was

14     Congress itself rather than individual law enforcement

15     officers, and that implicates the overall adjusted offense

16     level for Group 2, and we'll discuss that later.

17             All right.  For the Group 1 offenses, probation

18     calculated the offense level as follows:

19             The base offense level was taken from the

20     aggravated assault guideline at Section 2A2.2 of the

21     guidelines, which is 14.

22             Why don't we stop there.  There was an objection

23     by the defense to the application of that particular

24     guideline.  I've read your papers, but I'm happy to hear

25     anything else you'd like to add on that.

```
1              Mr. Roots or Mr. Pierce?

2              MR. ROOTS:  Yes.  The jury found -- the jury

3    convicted on, for assault, 18 U.S. Code Section 111A, I

4    believe it was.  It should not get to 14.  At the most it

5    would be 13.  And that is significant because it puts him

6    over that line on the sentencing table.  And so I don't even

7    know how they got to 14.  It actually should be 10, we

8    believe, under the -- you know, for resisting or opposing an

9    officer.

10             And, remember, that statute is worded, you know,

11   in a strange way.  It says anyone who assaults, opposes,

12   resists, I think even intimidates an officer should be -- so

13   I think the jury found guilt on that, but, you know, we

14   don't have a precise, you know, measuring rod to determine

15   which of those words the jury found.

16             THE COURT:  Okay.

17             MR. ROOTS:  So we just don't believe it's a score

18   of 14.

19             THE COURT:  All right.  According to 2A2.2,

20   aggravated assault equals -- is defined as felonious assault

21   that involved, among other things, an intent to commit

22   another felony.  Here probation found that he did intend to

23   commit another felony in the course of interfering with the

24   officers and --

25             MR. ROOTS:  If I could just speak to that just a
```

1       little bit?

2                   THE COURT:  Yes.

3                   MR. ROOTS:  The other felony is Count 1, the civil

4       disorder.  So here's an assault of an officer with the

5       intent to commit another felony, which is resisting an

6       officer during a civil disorder.

7                   So, again, it's almost double-counting.  It's

8       not -- it's not an assault with an attempt to commit, for

9       example, a rape or a burglary or a robbery or anything like

10      that.  It's almost like a double statement of the same sort

11      of proposition.

12                  So it really shouldn't be aggravated assault at

13      all.  It's assault.  He was convicted of assault of an

14      officer; a serious crime, but it shouldn't be aggravated

15      assault, you know, with an intent to commit another felony,

16      which is the same exact act, resisting officers.

17                  THE COURT:  Mr. Nohria, there are several other

18      assaults obviously.  Do you want to be heard on the

19      aggravated assault guideline?

20                  MR. NOHRIA:  On that, Your Honor, it's not double-

21      counting because the civil disorder includes other elements

22      that aren't included within the 111; and, therefore, the

23      defendant, in the context of the civil disorder, which is a

24      continuing course of conduct, committed an additional

25      assault throughout that -- throughout that day on January

```
 1     6th.

 2              So there's no double-counting here.

 3              THE COURT:  Okay.  The Court will accept

 4     probation's calculation of the base offense level at Level

 5     14.

 6              Probation applied two specific offense

 7     characteristics and one victim-related adjustment as well as

 8     an obstruction of justice adjustment.

 9              Starting with the first specific offense

10     characteristic, there was a two-point upward adjustment for

11     more than minimal planning based on the defendant's bringing

12     a gas mask, body armor, and other military gear with him.

13              Application Note 2 indicates that "more than

14     minimal planning" is more planning than is typical for the

15     commission of the offense in its simple form, and it

16     includes, for example, efforts to conceal, like wearing a

17     gas mask.  The defendant's preplanned efforts to mitigate

18     the obvious response by police by wearing a gas mask and

19     body armor constitute more than minimal planning than is

20     typical in this offense, so the Court will apply the two-

21     level adjustment.

22              The second specific offense characteristic

23     probation applied was four points for the use of -- because

24     a dangerous weapon was otherwise used in the offense under

25     Section 2A2.2(b)(2)(B) of the guidelines, and this brings us
```

1    to whether the pallet was used as a battering ram or was

2    simply brandished or displayed or otherwise used by the

3    defendant.

4              Mr. Roots, do you want to be heard on that?

5              There was a four-level enhancement.  That section

6    also provides for a three-level enhancement in the

7    alternative, if the weapon was brandished or displayed in

8    some way.

9              MR. ROOTS:  Yes.  Now, keep in mind that all

10   through this case, from the very moment of the filing of

11   these indictments, they've accused Mr. Alberts of possessing

12   a weapon, a gun on his -- that was -- that he carried, and

13   never did they pronounce a deadly and dangerous weapon to be

14   some kind of -- let's put it this way.  It's obvious that

15   they can't use the firearm to get to these enhancements,

16   so right now, at the sentencing stage, they suddenly shift

17   gears and say, well, no, we mean this wooden pallet thing

18   that Mr. Alberts picked up and held.

19             And the evidence is absolutely resoundingly clear.

20   The jury saw that evidence.  He picked up a wooden pallet-

21   type object and used it as a shield, a defensive shield.

22             There, of course, were less lethal rounds.  There

23   were officers firing things not only in the direction of

24   Mr. Alberts but over -- you know, above -- at other

25   individuals, and Mr. Alberts plainly did not use this wooden

1    object as a weapon.

2         The government keeps using the term "battering

3    ram." Nothing that the jury saw indicates use as a

4    battering ram.

5         Now, there is a way you could use a wooden pallet

6    as a battering ram. You could use the sharp end, and you

7    could try to use it as a battering ram and shove it forward

8    as a weapon to harm someone or hurt or injure someone.

9         That's not what the jury found. That's not what

10   the evidence showed in this case.

11        Mr. Alberts lifted up a wooden pallet in the way

12   that someone holds a shield, which is a defensive -- a

13   defensive use. There was some contact, very brief contact.

14   It did not injure anyone. No officer reported being

15   injured.

16        He plainly did not use that wooden pallet as a,

17   quote, dangerous and deadly weapon.

18        THE COURT: Okay. Mr. Nohria.

19        And let's approach the lectern if you're going to

20   address the Court, okay?

21        MR. NOHRIA: Your Honor, the government would

22   first note that the standard is preponderance for the Court

23   to find these facts at sentencing rather than the jury.

24        And I would also note that under the definition of

25   "dangerous weapon" under 2A2.2(b)(2)(B), other objects,

1    including a boot, a belt, firewood, have all been found to

2    be dangerous weapons.  And that includes, in many other

3    January 6th cases, a riot shield.

4         Now, as to the point that the defendant didn't use

5    the sharp end of the wooden pallet, just because the

6    defendant didn't use the dangerous weapon in the most

7    effective way possible does not mean it is not a dangerous

8    weapon.  The defendant didn't remain stationary with this --

9         THE COURT:  I don't think there's a dispute as to

10   whether a -- the pallet is a dangerous weapon based on the

11   guidelines definition, which is an instrument capable of

12   inflicting death or significant bodily injury.  There's no

13   intent element.  So I think it's clear that it is a

14   dangerous weapon under that definition.

15        The question is, did he simply display or brandish

16   it, or did he otherwise use it, which the guidelines define

17   as something more than displaying and brandishing in an

18   intimidating manner?

19        MR. NOHRIA:  Yes, Your Honor, and I think in the

20   government's sentencing memo we tried to draw a distinction

21   between if the defendant had simply displayed or brandished

22   it in the sense of there were other rioters who held the

23   pallet in a defensive posture along the side of the railing

24   and they didn't move forward.  Essentially they stayed in

25   that stationary position and were just holding it up at that

1    point.

2         The defendant, instead, picks up that wooden

3    pallet and rushes forward up those steps directly coming

4    into contact with those officers, and the only reason that

5    the defendant didn't create more injuries or actually lead

6    to that damage is because the officers were treated in the

7    face of the defendant's charge with that wooden pallet.

8         So I think his intent is clear, especially when

9    you consider the defendant's words and rhetoric on January

10   6th and on that day.

11        THE COURT:  We've looked at this video numerous

12   times.  I think it's actually a fairly close call under the

13   circumstances, but I think that he did more than simply

14   display or brandish it by using it as a -- not a defensive

15   shield necessarily, but using it -- not a defensive shield

16   in the legal sense of self-defense, but using it to

17   facilitate his march up the stairs to breach the line in a

18   way that was certainly intimidating or threatening to

19   officers.  And whether the contact was intentional or

20   incidental, you know, I'm not sure I have to decide that,

21   but based on the guidelines definitions, the Court will

22   apply the four-point enhancement or adjustment as opposed to

23   the three-point for simply displaying or brandishing.

24        All right.  Finally -- or not finally, but there

25   was also a victim-related adjustment because the victim was

1    a government officer, namely Capitol Police officers.

2            I know that, Mr. Roots, you have an argument that

3    that may result in some double-counting because the

4    statutory offense is resisting law enforcement, but, by the

5    plain language of the guidelines, it clearly applies here

6    because the victims were individual law enforcement

7    officers.  So the Court will apply the six-level adjustment

8    for that under 3A1.2(b).

9            And finally, there was an obstruction of justice

10   adjustment under Section 3C1.1 based on Mr. Alberts's false

11   statements from the witness stand.  And why don't -- you can

12   be heard on that, Mr. Roots.

13           MR. ROOTS:  Yes.  This is really -- this is

14   dangerous to American due process.  Imagine if the

15   government could say that any time a defendant takes the

16   stand in his defense and then, you know, his defense, you

17   know, is found -- for whatever reason the jury convicts him,

18   then the government can then claim and get enhancements at

19   sentencing upon the basis that he committed perjury by

20   saying he was innocent.

21           Just imagine -- this is -- this cannot be law.

22           THE COURT:  Mr. Roots, the government and

23   probation don't just say he took the stand.  That's not the

24   reason they've applied the adjustments.

25           They've pointed to at least five or six very

1    specific statements that he made and evidence that they say

2    contradicts those statements in a way that shows that he

3    didn't tell the truth.  So why don't you address those

4    particular statements that are at issue.

5              MR. ROOTS:  Yes, specifically -- just specifically

6    one of the claims that he committed perjury on the witness

7    stand, I believe he testified about the gear that he wore,

8    the clothing that he wore, you know, that it was defensive

9    in nature.

10             He testified that he was familiar with rioting in

11   Washington, D.C., at the prior Stop the Steal rally in

12   December 2020.  There had been rioting, and there had been

13   Antifa attacks on the Trump supporters.  This was at those

14   earlier episodes.  He was aware of this, he testified.  He

15   has knowledge, and that's why he wore body armor.  That's

16   why he wore what he wore and packed his gear such as it was.

17             So he took the stand and said he had that as

18   defensive, and then, you know, the jury did convict him of

19   charges.

20             Then the government says, "Well, that's a lie.  He

21   lied on the stand.  He was really there wearing body armor

22   to attack Congress or to attack people," and that clearly --

23   that cannot be the standard here.

24             The jury disagreed or for whatever reason found

25   guilt, but that cannot be because it's -- the evidence is

 1     quite plausible -- you could argue either direction, and you

 2     can't say that Mr. Alberts lied when there isn't direct --

 3     you'd have to dig into his mind and find a statement or an

 4     email saying, "Hey, I'm really secretly wearing this as an

 5     attack to go on the offensive."  You'd have to find

 6     something like that to say that it was a lie.

 7              THE COURT:  Mr. Roots, he donned the gas mask

 8     before he went up the stairs to confront the officers, which

 9     we saw on video however many times.  Is it reasonable that

10     he thought those officers were Antifa, and that's why he put

11     the gas mask on, as he testified?

12              MR. ROOTS:  Remember there --

13              THE COURT:  He knew they were officers, right?

14              MR. ROOTS:  Well, no question about that.

15              But remember excessive force by officers justifies

16     self-defense.  So it is very clear in this case and other

17     January 6th cases, officers were shooting at the faces with

18     so-called less lethal rounds, which is a violation of their

19     own policies.  Officers were spraying people at very close

20     ranges with very dangerous chemicals.  So that -- just the

21     fact that putting on a gas -- by the way, putting on a gas

22     mask for demonstrations and riot is not unusual.  It's just

23     a common thing people do, especially when there's tear gas

24     in the air.

25              I would not say that that is planning -- excess

 1    planning or that it shows an offensive intent on the part of

 2    Mr. Alberts.

 3          Some of the other specifics that they claim that

 4    he, quote, lied on the stand.  I'm trying to think.

 5          Another one was -- well, what were they?

 6          Each one of them is -- has an explanation of

 7    Mr. Alberts speaking truthfully.  So he took the stand and

 8    was speaking truthfully.  Just because another person says

 9    something else doesn't mean that he gave false statements on

10    the stand.

11          Again, you would need an email or some statement

12    from Mr. Alberts, maybe a YouTube video, a statement,

13    saying, "Hey, I'm secretly wearing this stuff as an attacker

14    of law enforcement."  They don't have that.

15          They do have plenty of evidence that substantiates

16    and actually supports Mr. Alberts in this -- in, you know,

17    why he wore what he did.

18          The other specifics -- by the way, Alberts just

19    pointed out he has hearing problems.  That's well

20    documented.  Medically diagnosed.  He has hearing problems.

21    He does have difficulty hearing officer commands or whatnot.

22          And, of course, you know, putting on a gas mask,

23    you know -- nothing -- nothing indicates he was expecting to

24    be -- you know, to be in any kind of confrontation with law

25    enforcement by doing that.

1          His testimony was, specifically, as I recall, that

2    he went up the stairs with the gas mask on because it was

3    a nerve-gas-laden or a tear-gas-laden area, and he was

4    there -- he went up there to do several things, one of which

5    was to render aid to another man who had been blasted in the

6    face with tear gas.  And that was Mr. Guy Reffitt, who was

7    in a state of some trauma there.

8          And so, you know, it can't be said that what he --

9    that what Mr. Alberts testified to constituted any kind of

10    false testifying on the stand.

11          And, again, this is just very dangerous to

12    establish some kind of a precedent where if you take the

13    stand in your defense and say you're innocent and the jury

14    comes back guilty, that you can then be enhanced -- have

15    enhanced sentencing for lying on the stand.  This is

16    absolutely -- none of the specific points -- I'm trying to

17    think, what were the other five things?

18          MR. NOHRIA:  I believe it was that Mr. Alberts did

19    not know that the Capitol building was restricted; that he

20    had brought the gas mask to provide efficient medical care

21    to women and children; that he only had the bungee cords for

22    camping; that he was unable to understand the verbal or

23    physical hand gestures from the U.S. Capitol Police officers

24    at the top of the stairwell; and that he only waved other

25    rioters from the stairwell because he wanted them to join

1  him on the stairwell to assist in bringing an injured

2  protester down.

3          MR. ROOTS:  Okay.  I'd like to address a couple of

4  those.

5          The bungee cords.  I'm a backpacker myself.  I

6  have bungee cords that are always in my backpack.  It's a

7  common thing, to have a backpack packed with stuff.  And so

8  if you're a camper, and you have -- it's outrageous that you

9  can be accused of lying if you say, "Hey, I happen to have

10 bungee cords at all times in my backpack."  That's

11 preposterous.

12          The restricted area stuff is in some ways at the

13 heart of this case, which is -- the evidence showed it very

14 clearly -- that nothing that Mr. Alberts actually passed by,

15 there was not any kind -- there was no fencing that he

16 jumped over.  There was no officer saying it was a

17 restricted area.  There was no sign that said "Restricted

18 Area," "Closed Area," that he saw in his own path of

19 movement.

20          And, remember, there was a crowd of hundreds of

21 others around him who also apparently, according to the

22 observations of Mr. Alberts, they didn't think it was a

23 restricted area at that moment at that time under the law at

24 that time.  So the fact that he said that should not expose

25 him to enhancements for false testimony when, in fact, the

1    evidence is pretty clear to me that he testified absolutely

2    honestly and accurately on those things.

3         Again, the hearing problems.  Now, the prosecutor

4    just mentioned that Mr. Alberts at some point appeared to

5    wave or something.  There are officers on the stairs that

6    were waving people to come forward, and I believe the

7    officers testified that they were waving at other officers

8    to come forward.

9         Well, is that really clear from the video?  I

10   mean, what if Mr. Alberts was also waving at other officers

11   to come forward?  I mean, it becomes a game of saying that

12   you didn't -- I mean, saying that when you said one thing on

13   the stand and then you were convicted, that you can then be

14   enhanced.

15        This is absolutely a terrible, terrible argument,

16   and it can't be the law.  People have a right to take the

17   stand.  They have a right to testify in their defense.  They

18   have a right to make arguments for their defense and say

19   that they're innocent.

20        THE COURT:  Mr. Nohria?

21        MR. NOHRIA:  First, Your Honor, the government

22   would note that the standard here is still preponderance of

23   the evidence for evaluation of Mr. Alberts's testimony on

24   the stand and that the limiting principle is that the

25   testimony cannot result from confusion, mistake, or faulty

1    memory, and rather must reflect a willful attempt to

2    obstruct justice.  And the Supreme Court has actually

3    repeatedly addressed that a defendant's right to testify

4    does not include the right to commit perjury.

5            So in addition to the statements that the

6    government's already referenced in its sentencing memo, I

7    would also like to point out that the defendant said he

8    didn't go back down the stairwell after U.S. Capitol Police

9    had deployed nonlethal measures because he hadn't been

10   trained on moving backwards, and that he only picked up the

11   wooden pallet that he later used as a battering ram because

12   he wanted to dispose of it.  And I think that's also

13   directly contradicted by the video evidence and essentially

14   a time gap between when the wooden pallet is placed down and

15   Christopher Alberts, the defendant, picks it up immediately

16   and charges forward.  There's no time gap.  There's no

17   indication of going over to the side to dispose of it over

18   the railing.

19           And so in addition to the points I've already

20   made, I think that it's pretty clear the defendant gave

21   false testimony and that the same enhancement has been

22   applied in a number of other January 6th cases where the

23   jury rejected the defendant's testimony on the stand.  And I

24   can go through those, if the Court would require it.

25           THE COURT:  That's not necessary.

1          So the Court finds by a preponderance that at

2     least one, if not all, of the statements noted by probation

3     constituted false statements and not simply were the result

4     of confusion, mistake, or lapses in the defendant's

5     recollection or memory that he did not encounter anything

6     that would indicate that the Capitol was restricted.

7          I would note that he was there very early, before

8     the rally at the Ellipse ended.  There was lots of video and

9     testimonial evidence introduced at trial of physical

10    barriers and police officers indicating to a reasonable

11    person that they were not supposed to be on Capitol grounds

12    that day.  It defies credibility that Mr. Alberts would not

13    have seen any of those indicators.

14         Testimony that he was unable to comprehend both

15    verbal commands and hand gestures of the officers.

16    Certainly the officers' intent was clear, including their

17    use of nonlethal ammunition, as the defense has noted many

18    times, indicating that Mr. Alberts should have left, was not

19    authorized to be on Capitol grounds.

20         And even their verbal commands.  There were a

21    number of videos where Mr. Alberts can be seen in verbal

22    back-and-forths with police.  No indication that he did not

23    understand what they were saying or was not able to respond

24    back to them.

25         His testimony that he could not retreat down the

1    stairs because he wasn't trained to do so.  It was clear

2    from the video that no special training was required, and

3    that he easily could have extricated himself from the stairs

4    at numerous junctures.

5         That he picked up -- the testimony that he picked

6    up the pallet because it was placed at his feet and wanted

7    to dispose of it, that is contradicted by the video.

8    Whether or not he used it as a battering ram, clearly he

9    wasn't looking for a place to dispose of it.

10        And finally, he testified that he waved on the

11   crowd to get them to help to bring an injured person down.

12   The video evidence shows otherwise, as well as testimony on

13   cross-examination that he did that to encourage others to

14   come to the terrace to, quote, have their voices heard.

15   Again, that testimony is not the result of confusion,

16   mistake, or lapses in memory; and, therefore, the Court

17   finds that the two-level obstruction of justice adjustment

18   is appropriate.

19        So that leads to an adjusted offense level of 28

20   as calculated by probation for the Group 1 offenses.

21        Moving to Group 2, probation applied the same

22   aggravated assault guideline, which is Base Offense Level

23   14, the same two-point adjustment for more than minimal

24   planning, and the same obstruction of justice adjustment,

25   two points, for the false testimony, leading to an adjusted

 1    offense level of 18.

 2            The probation office did not apply the victim-

 3    related adjustment for the count -- for the Group 2

 4    offenses.  The government objects to that exclusion.

 5            Mr. Roots, I don't want to replow territory that

 6    the Court has already ruled on.

 7            MR. ROOTS:  Well, if I could just make a quick

 8    remark about that.

 9            THE COURT:  Okay.

10            MR. ROOTS:  Is it the Court's position that Dave

11    Sumrall, a defense witness, also lied on the stand when he

12    said he thought it was not restricted?

13            So we're going down a very dangerous path --

14            THE COURT:  The Court has ruled, Mr. Roots, okay?

15    You'll have an opportunity to appeal both the conviction and

16    the sentence.  The Court has ruled.

17            MR. ROOTS:  One question is you said at least one

18    of the five that you found, Your Honor, that was false

19    testimony.  I don't know, could we get that itemized?  Which

20    one of the five did you say was absolutely clear?

21            THE COURT:  All of the ones that I mentioned on

22    the record for the reasons that I mentioned.  Okay?

23            Do you want to address the victim-related

24    adjustment for the Count 2 group, Mr. Nohria?  It's your

25    objection.

```
 1              MR. ROOTS:  Yes, the victim --

 2              THE COURT:  Mr. Roots, it's his objection.

 3              MR. ROOTS:  Oh, I'm sorry.

 4              THE COURT:  This calculation favors the defendant,

 5     so I'm going to hear from the government.

 6              MR. NOHRIA:  Yes, Your Honor.

 7              I would only draw the Court's attention to the

 8     difference between 3A1.2(a) and (b), which specifies --

 9              THE COURT:  Hold on.  Let me get there.

10              MR. NOHRIA:  Yes, Your Honor.

11              (Pause)

12              THE COURT:  Okay.

13              MR. NOHRIA:  So, Your Honor, Subsections (a) and

14     (b), when combined, have the requirement that the victim for

15     the offenses have been a government officer and that the

16     offense of conviction was motivated by such a status, and

17     that's what the government relied upon for Count Group 1.

18              But for Count Group 2, we rely on 3A1.2(c) as we

19     noted in our objection letter.  Now, that provision does not

20     include the requirement that the official victim had been

21     the officer.  Instead, it only requires that the law

22     enforcement officer was assaulted during the course of the

23     offense; in this case, entering and remaining on Capitol

24     grounds, disorderly conduct on Capitol grounds, and civil

25     disorder.
```

1          And now I would note that this has also been

2     applied to -- this provision has been cited in other cases

3     with respect to 1512 where, again, the victim is Congress

4     because an officer was assaulted in the course of

5     obstructing Congress or in the course of obstructing a

6     civil -- or in the course of committing the civil disorder

7     or disorderly conduct on Capitol grounds.  So the dropping

8     of that requirement from Subsections (a) and (b) to (c) is

9     very important.

10          THE COURT:  Hold on.

11          (Pause)

12          THE COURT:  It still requires an assault, and an

13     assault was not necessarily a basis for the conviction.  So

14     you would have to apply Subsection (c),(1) or (2).  You

15     would have to convince me by a preponderance that there was

16     an assault on the officer.

17          MR. NOHRIA:  Your Honor, I think in terms of the

18     assault, I mean, there's been a number of conduct.

19     Obviously there's the defendant, which he admitted on the

20     stand, throwing the bottle at the officers when they were

21     forming a police line.  That was admitted during the course

22     of the trial.

23          And there's also the conduct at the top of the

24     northwest stairwell, where he went hands on with a U.S.

25     Capitol Police officer and then charged at them with the

1    wooden pallet.

2           And I would just only -- I believe the commentary

3    to Subsection (c) indicates that it applies in circumstances

4    tantamount to aggravated assault against a law enforcement

5    officer committed in the course of or in the immediate

6    flight following another offense.

7           THE COURT:  Ms. Field, the report, I don't

8    believe, responds to the suggestion that 3A1.2(c) applies.

9    I think your response was that because the victims were

10   different Subsection (a) did not apply.  Have you given any

11   thought to Subsection (c)?

12          THE PROBATION OFFICER:  Yes, Your Honor.  Still

13   for the same reasons because Count Group 2 -- because the

14   victim of Count Group 2 is Congress, not any victim

15   officers, it's our position that that enhancement doesn't

16   apply.

17          THE COURT:  Okay.  So there's -- no law has been

18   cited by either side on this particular issue, and I'm not

19   in a position to research probation's position at this

20   point, but it does make some intuitive sense to me that

21   because the groups involve different victims, that a victim-

22   related adjustment based on an assault of an officer would

23   not apply to Group 2.

24          So the Court will adopt probation's

25   recommendation, not apply the six-level enhancement to the

1    Group 2 offenses, leading to an adjusted offense level of

2    18.  Because the Group 2 level is more than nine levels

3    below the Group 1 level, probation did not apply a multiple

4    count adjustment, which the Court agrees with.

5        Therefore, the Court calculates the total adjusted

6    offense level at 28.

7        Mr. Alberts has no criminal history or at least

8    countable criminal history, which results in an advisory

9    Sentencing Guidelines range of, as calculated by probation,

10   78 to 97 months.

11       All right.  All of your objections, Mr. Roots, are

12   noted for the record.

13       All of the government's objections are also noted

14   for the record.

15       All right.  The government has already argued for

16   a number of upward adjustments or upward departures.

17       The defense has argued for at least one downward

18   departure based on particular guidelines provisions.

19       Why don't we deal with those in connection with

20   the discussion of the 3553(a) factors.

21       Okay.  Probation has issued a recommendation of a

22   sentence of 60 months on Counts 1 and 6, which is the

23   statutory maximum; 78 months concurrent on Counts 2, 3, and

24   4, which is under the eight-year statutory maximum for Count

25   2 and the ten-year statutory maximum for Counts 3 and 4; a

1    sentence of 12 months on Count 5; a sentence of six months

2    on the two misdemeanor counts, 7 and 8; and a sentence of

3    six months on the D.C. Code count, Count 9, all to run

4    concurrently.

5            Probation also recommends a period of 36 months of

6    supervised release, restitution, a $645 special assessment,

7    and no additional fine.

8            So, with that, would the government like to be

9    heard on the 3553(a) factors?

10            MR. NOHRIA:  Yes, Your Honor.  Before we get to

11    that, the government -- Officer Sherman is here in the

12    courtroom today, and the government requests the ability for

13    him to present his victim impact statement.

14            THE COURT:  Very well.  You want to do that now?

15            MR. NOHRIA:  Yes, Your Honor.

16            MR. ROOTS:  Your Honor, we do have an objection to

17    this.

18            THE COURT:  Excuse me?

19            MR. ROOTS:  We do have an objection to this.

20            THE COURT:  Your objection's overruled.

21            Good morning, sir.

22            CAPITOL POLICE OFFICER SHERMAN:  Good morning,

23    Your Honor.  I'm just going to read my packet.

24            THE COURT:  Sure.

25            CAPITOL POLICE OFFICER SHERMAN:  Good morning --

```
 1              THE COURT:  And if you could pull that mic closer

 2        to you.

 3              CAPITOL POLICE OFFICER SHERMAN:  All right.

 4              Good morning, and thank you, Your Honor, for

 5        allowing me to speak at this hearing.  My name is Stephen

 6        Sherman, and I'm an officer with the United States Capitol

 7        Police.  Mr. Alberts and I met on January 6, 2021, at

 8        approximately 1400 hours when we squared up against each

 9        other on the northwest staircase of the U.S. Capitol.  I was

10        protecting the Capitol from a mob of rioters trying to fight

11        past officers by any means possible and gain entry into the

12        building.  I was on the staircase forming a police line in a

13        defensive posture.  I did not have any offensive weapons

14        unholstered and held only a riot shield while I gave the

15        defendant multiple lawful orders to stop what he was doing.

16              At that moment the defendant was at the highest

17        point on the staircase.  He was the rioter closest to the

18        stop of the steps where a direct path to the U.S. Capitol

19        windows and doors stood unprotected.  When I gave the

20        defendant lawful orders to stop, he could have come to his

21        senses and realized that the crimes he had already committed

22        to reach that point were enough, and he could have turned

23        around.  Others in the riot may have even followed him.

24              But instead he decided to pick up a wooden pallet

25        used for the inauguration stage and ram it directly into me.
```

1    This forceful impact made it impossible for me to deal with

2    both him and another rioter who was reaching over top and

3    grabbing my riot shield from my hands.  Mr. Alberts was

4    pushing hard against me while the other rioter was pulling

5    me down the staircase by my shield.  This push/pull force on

6    my body while trying to keep my balance on a tall marble

7    staircase caused for an extremely dangerous situation.  I

8    was forced to give up my shield and retreat back up the

9    stairs to a safe space in order to take out my ASP baton and

10   return to the fight against the defendant and the other

11   rioters.

12       While engaging with Mr. Alberts, a third rioter

13   sprayed me with an unknown chemical agent forcing me to

14   rapidly retreat all the way to the top of the staircase

15   where I received medical assistance from other officers.

16   This assault with the chemical agent was a direct causation

17   of having to fight with Mr. Alberts down the staircase and

18   away from my back-up officers.

19       The pain and suffering from that -- from this

20   spray was traumatic due to being the second time I was

21   sprayed that day, and I was already at a diminished capacity

22   to absorb such pain and trauma. I instantly knew that the

23   damage done by the spray would cause me to not be able to

24   breathe normally or see without unbearable, torturous pain

25   for quite some time.

1    While fighting against the defendant for my life

2    on those steps I felt as though someone in the crowd was

3    going to take out a firearm and start assassinating myself

4    and other fellow officers.  After seeing and feeling the

5    anger and rage in the defendant that day, it's no surprise

6    that he came armed and ready to turn my fears into a

7    reality.  The rage in the defendant and the helpless feeling

8    of possible imminent death are emotions I will live with for

9    the rest of my life.

10    I was forced into the Capitol building after

11    fighting with the defendant to further decontaminate from

12    being sprayed.  While starting to partially recover, a call

13    came over the radio that the rioters had gained entry into

14    the Capitol.  At that point, myself and maybe a few dozen

15    other injured officers were forced to gather everything we

16    could and retreat to a small health unit in the Capitol

17    Visitor Center where the same feeling of imminent death fell

18    upon me.

19    I looked around at myself and other officers to

20    try and count the amount of rounds of ammo we had on us

21    because I felt there was about to be a shootout, and we

22    probably weren't going to survive.

23    By the defendant using the wooden pallet against

24    myself and other officers, and paving the road for other

25    rioters to gain access to the building, I hold him very much

1    responsible for these emotions and feelings.

2         After barricading ourselves inside that health

3    unit inside the Capitol it became immediately apparent that

4    if we stayed there there was a good chance we could die.  So

5    we decided to use the tunnels to traverse over to the

6    Rayburn health unit.

7         The emotional anguish and pain and suffering

8    caused by Mr. Alberts's actions against myself and other

9    officers that day only got worse when I could not get in

10   touch with my wife, who is a fellow U.S. Capitol Police

11   officer and was assigned to the Civil Disobedience Unit that

12   day.  I knew her assignment would land her in the middle of

13   the fight, and when I could not reach her over the phone a

14   helpless feeling that she was seriously injured or dead fell

15   upon me.

16        Priority call after priority call were coming out

17   that officers were down, and I could not help but think that

18   my wife was possibly dead.  I couldn't get to her that day

19   and help her.  She was stuck in the Lower West Terrace

20   tunnel with her head being bent backwards against a cement

21   wall for hours while she fought harder than maybe anyone

22   that day to protect the Capitol.  She suffered that day,

23   both physically and emotionally, and my inability to help

24   her was directly due to the felonious acts carried out by

25   Mr. Alberts.

1          To you, Mr. Alberts, I say that when we first met

2     and before you ever physically assaulted me you had every

3     opportunity to turn around and walk away.  You had multiple

4     opportunities to come to your senses and leave.  But instead

5     you made a conscious decision to pick up a wooden pallet and

6     use it as a dangerous battering ram against me.  You created

7     a dangerous situation where you left myself and other

8     officers in serious risk of serious bodily harm or death by

9     violently ramming us while we were in a very precarious

10    position on steep marble steps.

11          You came to the U.S. Capitol that day armed with a

12    gun and extra ammunition.  You had on body armor with metal

13    plates.  You came to the Capitol that day to start a war,

14    and you, in fact, turned that staircase into a war zone.

15    You used that wooden pallet as a dangerous weapon in a

16    manner that could only be envisioned in a medieval battle.

17    You ascended those hallowed steps faster than almost any

18    other rioter that day and bulldozed your way to the top.

19    You paved the way for everyone else to follow.  You were a

20    leader of the mob that day.  You led the mob to the top

21    where they had little resistance to the U.S. Capitol,

22    Members of Congress, and their of staff.

23          There were many bad actors that day, but you were

24    among the worst.  Your actions that day set in motion a lot

25    of the devastation that was carried out.  Your actions

1    directly and indirectly caused physical and emotional

2    injuries against myself and other fellow officers that we

3    will carry with us for the rest of our lives.

4            There's a common thread of emotions amongst

5    many officers who were defending the Capitol on January 6,

6    2021, which is that we all thought we were going to die.

7    Mr. Alberts directly contributed to these fears and anguish.

8            For weeks following the attacks on the Capitol I

9    had a hard time going back home and not feeling as though I

10   had been doxed and that the rioters were going to show up at

11   my house and finish off both me and my wife.  Mr. Alberts

12   directly caused this mental anguish.

13           For everything mentioned here today, I strongly

14   believe Mr. Alberts deserves every year possible on his

15   sentence.

16           Thank you, Your Honor.

17           THE COURT:  Thank you, sir.

18           Mr. Nohria, I know that the victim impact

19   statement was filed under seal.  Now that he has read it

20   into the record, any objection to unsealing it?

21           MR. NOHRIA:  No, Your Honor.

22           THE COURT:  Okay.  We'll unseal it.

23           MR. NOHRIA:  Your Honor, as stated in the

24   government's sentencing memo, the government's requesting a

25   total of 120 months of incarceration, and that's because

1    while armed with a loaded nine-millimeter pistol and an

2    extra magazine, Christopher Alberts joined the mob to attack

3    the U.S. Capitol and disrupt the peaceful transfer of power

4    on January 6th.

5         At a key chokepoint to access into the Capitol

6    building, the northwest stairwell, the defendant used his

7    military style gear, including a gas mask and body armor, to

8    bulldoze through pepper spray and PepperBalls that were

9    deployed by the U.S. Capitol Police to hold the line.  He

10   picked up a large wooden pallet and used it as a battering

11   ram against the officers guarding that stairwell.

12        In addition, he threw a bottle at a line of law

13   enforcement officers that were under siege.  He berated

14   other law enforcement officers calling them domestic

15   terrorists and treasonous communist motherfuckers.  He urged

16   law enforcement to step aside so he and other patriots could

17   sweep across the country and wipe them out.

18        I want to draw the Court's attention to briefly

19   just five key points regarding Mr. Alberts's behavior, and

20   that, first, is the defendant's gun and ammunition, which is

21   not currently factored into the guidelines sentence.  And

22   that's -- the defendant obviously committed these offenses

23   while carrying a loaded gun.  That's beyond question.  But I

24   think it's important to consider that the defendant's gun

25   had a full magazine, 12 rounds, and a chambered round for a

1    total of 13.  That's important because I think it goes to

2    Christopher Alberts's intent; the fact that he loaded his

3    gun, chambered a round, and then made sure to go back and

4    add an additional round of the magazine to ensure that it

5    was as full as possible on January 6th.

6         These also weren't normal rounds.  The defendant

7    had loaded his gun and extra magazine with high-pressured

8    and hollow point rounds, rounds that are designed to be more

9    deadly than the standard ammo.  They're designed to expand

10   on impact and tear through flesh.

11        So on January 6th Christopher Alberts wanted to

12   make sure he was as lethal as possible.

13        And he wasn't the only one.  I think it's

14   incredibly important for the Court to consider that unknown

15   to the Capitol Police at that time, the two men leading the

16   charge on the northwest terrace -- on the northwest

17   stairwell to the Upper West Terrace were Guy Reffitt and

18   Christopher Alberts, both of whom were armed at that time

19   and facing down U.S. Capitol Police officers.

20        THE COURT:  So if his intent was to use the

21   weapon, why didn't he do it in the six hours he was there?

22        MR. NOHRIA:  The government's not saying his

23   intent was to use the weapon.  His intent was to be carrying

24   it at that time, and the fact --

25        THE COURT:  To what end?

1        MR. NOHRIA:  It's kind of unclear, Your Honor.  I

2    mean, just because the defendant didn't use it during that

3    time period doesn't show that his preparation, his intent,

4    and the seriousness of what would have happened if he had

5    drawn it --

6        THE COURT:  So the gun is considered in terms of

7    the preparation because you got a bump for more than minimal

8    planning.

9        MR. NOHRIA:  Yes, Your Honor.  But I think, as

10   noted in essentially the U.S. Guidelines 5K2.6, it makes

11   clear that if a weapon or dangerous instrumentality was used

12   or possessed in the commission of the offense; and that's

13   because the potential lethality in that situation is

14   increased.

15       If a U.S. Capitol Police officer had drawn their

16   weapon, it's possible Mr. Alberts would have done it, too.

17       If a U.S. Capitol Police officer had posed a more

18   direct threat to Mr. Alberts, it's possible he would have

19   drawn his weapon.

20       And I would only note that there was a video that

21   the government provided where Mr. Alberts is essentially

22   confronting a U.S. Capitol Police officer who is on the

23   ground -- this isn't on the northwest stairwell -- and he's

24   essentially riling himself up, and one of the statements he

25   made on the stand was, "I was very concerned because that

1    officer had his hand on his firearm."  And Mr. Alberts is

2    continuously pointing to his body armor, continuously

3    pointing to his military patches, and is essentially calling

4    the officer a number of words.

5          So all that is to say the potential for harm --

6    this is essentially -- when you consider the intent behind

7    the 1752(b)(1)(A) with possessing that firearm, this is as

8    serious of a circumstance Congress could have envisioned

9    when they were criminalizing carrying a firearm on to

10    Capitol grounds, and they are the ones who essentially

11    created that statutory maximum of ten years.

12          So I'd only say that the defendant's preparation,

13    his loading of the gun and his ammunition, all go to the

14    potential dangerousness as well as his intent and

15    preparation.

16          And I would only note that in addition to his

17    firearm and ammunition, he had a number of other items that

18    weren't standard with other January 6th cases and that

19    haven't been factored into his guidelines sentence either.

20    He had binoculars, bungee cords, a decontamination kit, two

21    knives, a two-way radio, a throat mic, and a black ski mask.

22          And the defendant on the stand also differentiated

23    between the soft body armor that he indicated he typically

24    wore on his day-to-day job and the hard body armor where

25    there were metal plates inserted into it designed to stop

 1    higher caliber rounds.  And those plates essentially did a

 2    lot of work, because where other rioters were cowed by the

 3    use of PepperBalls, the defendant could keep climbing.  And

 4    he even said having that body armor on I wouldn't have felt

 5    it.

 6              And I think, again, the Court's already addressed

 7    the gas mask; essentially that the defendant donned that gas

 8    mask 35 minutes before he climbed up the northwest stairwell

 9    where he knew there were other counter protesters around.

10              Next I'd like to move to the connection between

11    the defendant and the mob.

12              THE COURT:  Before you get there --

13              MR. NOHRIA:  Yes, Your Honor.

14              THE COURT:  -- you mentioned Mr. Reffitt.  You may

15    get to this when you discuss disparities, but he was armed

16    as well.  He received an 87-month sentence.  He had a higher

17    guidelines range, at least as calculated by the Court, but

18    some similar and some different conduct.

19              How would you compare Mr. Reffitt to Mr. Alberts?

20              MR. NOHRIA:  Yes, Your Honor.

21              So Mr. Reffitt, again, stood next to Alberts,

22    Mr. Alberts, at the forefront of the mob on that northwest

23    stairwell, which I think is a differentiating factor for

24    the other January 6th defendants because they're not on

25    the ground.  They're not at the base of the Lower West

1    Terrace.  They're at the forefront of the mob, and they're

2    leading the breach to the Upper West Terrace that leads to

3    the Capitol building to be breached.  And you're right.  He

4    was -- Mr. Reffitt was also carrying a concealed firearm.

5            But Mr. Reffitt wasn't wearing body armor or a gas

6    mask.  He didn't engage in violence.  And while Reffitt was

7    essentially a leader because of his location at the very

8    forefront of the mob and his refusal to back down, I think

9    the defendant gets put into a different category because,

10   yes, he was a leader, as Officer Sherman noted, because of

11   his location, but he was also a leader because of his

12   actions in picking up that pallet when he's essentially on

13   stage for everyone to see and running forward towards those

14   rioters.  He's charging them in the view of everyone.

15           And one of the government's exhibits -- I believe

16   it's Exhibits 308 and 309 -- shows the impact that that has

17   on the rest of the mob.  Where Mr. Reffitt is, the mob is

18   sort of seeing the continual push up towards the Upper West

19   Terrace.  When Mr. Alberts picks up that pallet and begins

20   running up, you see the crowd go wild.  They're screaming,

21   "Let's go."  They're tearing down that tent.  They're

22   starting to push more against the officers that they're next

23   to.  So it's a very big instigating factor.

24           Additionally, Mr. Reffitt left the Capitol grounds

25   faster.  The defendant was present for over six hours.

```
1            Mr. Reffitt didn't lie under oath, and the
2    defendant did, as the Court has already found.
3            So I think all of those go to essentially the
4    difference between the Reffitt case and the Alberts case.
5            THE COURT:  Mr. Reffitt did not enter the Capitol,
6    correct?
7            MR. NOHRIA:  I don't believe so.  No, Your Honor.
8            THE COURT:  And he got an obstruction enhancement,
9    but for evidence tampering basically.
10           MR. NOHRIA:  Yes, Your Honor.
11           THE COURT:  Okay.
12           MR. NOHRIA:  And just to clarify, I think the
13   defendant also knew the effect he was having on people.
14   During his testimony, the defendant at least three times
15   stated some variation of the crowd was complying with my
16   orders.  When he was discussing the northwest stairwell, he
17   said, "If they followed me, they followed me."  And he
18   stated that he was handed a megaphone because other rioters
19   wanted him to make his voice louder.
20           So what all that goes to show is I think Officer
21   Sherman was right, that Christopher Alberts was essentially
22   a leader of the mob through his actions.
23           Now, going to the assault, I only wanted to
24   address this briefly because I know the Court's reviewed
25   that video multiple times, but I just want to point out that
```

1     this assault could have resulted in far more significant

2     injuries; that as the defendant testified on cross-

3     examination when he was running with that pallet, he wasn't

4     aware that Officer Sherman had retreated up that stairwell,

5     and so he was expecting to encounter the resistance of

6     Officer Sherman.  He was expecting to encounter Officer

7     Kerkhoff and Sergeant DesCamp when he hit that top of the

8     stairwell with that wooden pallet, and essentially he

9     shouldn't receive credit just because the officers retreated

10    in the face of his charge.  His intent was to bulldoze with

11    whoever was in front of him and make it to that northwest

12    step landing.

13         Finally, I'd like to address the defendant's

14    rhetoric on January 6th and to this day.

15         Now, among his many other statements on January

16    6th, the defendant, Christopher Alberts, said the following:

17         Taking over the Capitol, patriots.

18         You all wanted the war.  You asked for it.  You

19    got it.

20         We can sweep this whole country and take them all

21    out.

22         We ain't going nowhere.

23         We'll be back tomorrow and the next day and on the

24    20th.

25         And the next time we come here, we ain't coming

1   here unarmed.

2          Now, to this day, even in hindsight, the defendant

3   has not accepted responsibility for his actions.  He hasn't

4   shown remorse.  He didn't take a plea offer, he didn't

5   testify that he regretted assaulting the officers, and he

6   didn't apologize in his sentencing memorandum.

7          He's essentially leaned into the false

8   righteousness of his conduct, and the Court should consider

9   that in the context for the need for specific deterrence,

10  because whether on podcasts or during the trial, the

11  defendant has said he still believes he was at the Capitol

12  to do what he was constitutionally allowed to do.  He stated

13  that he has a duty to overthrow his government and reinstate

14  a new government if the government is against the people.

15  And when discussing January 6th after the fact, he said, "I

16  stood on my morals that day, and I'm going to stand on them

17  again."

18          What makes Christopher Alberts so dangerous on

19  January 6th and to this day is that he decides what is

20  tyranny.  He decides who is treasonous, and he acts on that

21  belief, and he intends to continue acting on that belief.

22  Christopher Alberts had and has the training, the equipment,

23  and the conviction to do real damage.

24          And for all of those reasons, the government is

25  requesting the Court vary upwards and impose a 120-month

1    sentence to essentially account for not only the defendant's

2    assault, his positioning on the northwest stairwell, but

3    also incorporate the fact that he came with a loaded firearm

4    on to Capitol grounds with hollow point bullets and an extra

5    magazine.

6              THE COURT:  Thank you.

7              MR. ROOTS:  Thank you, Your Honor.

8              There was a lot there.  Let me just pick apart

9    some of this.

10             Remember, this is -- the government viewed this

11   case with all the facts the government knew and offered, I

12   believe, a 30-month plea deal, 30 or 32 or 34 months, so

13   that's what -- that's how serious they thought this case was

14   going -- prior to trial.

15             Now they're asking for, I think, ten years.  This

16   is -- when you think about it, they are punishing -- they

17   are seeking to punish Mr. Alberts for exercising his

18   constitutional right to go to trial.

19             Mr. Alberts rejected their plea offer, and he

20   shouldn't be punished with I guess I'm calculating three or

21   four times, five times greater of a penalty for exercising

22   his constitutional right to demand a jury trial.

23             Also, remember that on January 6th there was

24   another person also arrested with a gun on Capitol grounds.

25   That's my understanding, is that someone named Grimes --

1    might have been Natalie Grimes -- was arrested with a gun,

2    the same exact charge that Mr. Alberts is convicted of here,

3    on January 6th, that very night at about the same time, not

4    far away.

5         Mr. or Mrs. Grimes was captured with a gun and

6    charges were dropped almost immediately because, upon

7    inquiry, they found out that Ms. Grimes is not a Trump

8    supporter.  She's an anti-Trump protester, and because of

9    that, they just dropped the charges.

10        That's how serious the Department of Justice

11   regards being near the Capitol with a gun.  That's how

12   serious they regard that.  They literally dropped the

13   charges when they determined that Ms. Grimes was not a Trump

14   supporter.

15        There was a lot of discussion about how

16   Mr. Alberts, you know, he pointed to his patches.  He does

17   have a military background.  He was wearing some of his

18   surplus stuff, which he testified he commonly -- he wears a

19   gun on his daily job as a tow truck driver.  That might

20   seem, you know, unusual for residents of D.C., but for

21   residents of rural parts of Maryland and places where Mr.

22   Alberts lives and works as a tow truck driver, that was his

23   testimony, that this is just a common thing, that he wears a

24   gun on him pretty much every day.  That's part of his work

25   uniform.

1          I can just say I think that's -- if Your Honor

2    were to look at the landscape of America, there are people

3    that live in areas where they don't regard that as unusual

4    in the slightest way.

5          With regard to disparities, think of what they're

6    saying about disparities.  Guy Reffitt was sentenced to, you

7    know, seven years, so Mr. Alberts should be sentenced to,

8    you know, seven years or something.

9          Again, remember, there was that other person

10   arrested that same night with a gun who got nothing.  If

11   she's not a Trump supporter, nothing.

12         So when we talk about disparities, it shouldn't be

13   just with January 6th defendants.  It should be with the

14   whole array of people who are, you know, caught in riots and

15   things in D.C., and we all know the history of these things

16   in the area.  It has been pointed out by many January 6th

17   lawyers that the disparities are absolutely astounding in

18   that people who rioted -- for example, when Trump was

19   inaugurated in 2017 there were riots.  There was damage.

20   Cop cars were burned.

21         Many people -- many of those rioters got off with

22   either nothing or a very small fine.  I believe some of them

23   actually sued the city and won damages.

24         So that's the real examination of disparities.  It

25   has to -- we have to look into all this array of disparities

1    when people are, you know, caught rioting, protesting,

2    demonstrating, destroying property, turning over police cars

3    and things.

4            There was talk about rhetoric.  Mr. Alberts was

5    recorded on camera during that day, January 6th, with

6    statements, so he made statements about communist

7    motherfuckers and all this -- these hyperbolic rhetoric.

8            There was that one long speech that Mr. Alberts

9    sort of gave at the top of the West Terrace which actually

10   repeats fundamental American understandings of the right and

11   the duty to overthrow the government when the government

12   becomes tyrannical.  This is what we learned in grade

13   school, that we have these duties and rights under the

14   Declaration of Independence.

15           Mr. Alberts gave a spirited lecture about these

16   school yard aspects of American culture that we all learn in

17   Boys Scouts, that we do have the duty to overthrow the

18   government when it becomes tyrannical.

19           You know, and a lot of it is absolute hyperbole in

20   terms of, "If you cops would move aside, we would take back

21   America.  We would drive out there, corrupt" -- "we would

22   drive Antifa and wipe these problems out, and we'd fix

23   America."  All of that is political expression.  He should

24   not be punished for political expression.

25           I do want to point out in terms of departures,

 1    like no one else, Mr. Alberts really is entitled to a

 2    downward departure.  This man, upon examination, has lived a

 3    stellar life, an absolutely stellar life.  He is a pillar of

 4    the community.  He is a veteran of the armed forces, injured

 5    veteran.  He has suffered.  He has had, you know, disability

 6    issues.  But the record is clear that he is entitled to the

 7    downward departure for the fact that he shouldn't be

 8    punished for one day of his life.

 9           This man has lived an exemplary life, and everyone

10    who knows him would testify that he is a solid, wonderful

11    person who -- I believe he has saved three lives.  He's not

12    just an -- a trained EMT.  But there are three people

13    walking around today, from my calculations, that owe their

14    lives to Christopher Alberts.

15           He saved someone at a casino with -- gave CPR in a

16    public place on his birthday.  He was celebrating his

17    birthday at a casino; saved someone's life with CPR, and he

18    was thanked.

19           Another time he saved a small child from drowning

20    on the beach.

21           So there's three people walking around today who

22    owe their lives to Christopher Alberts.  This is an absolute

23    wonderful human being.

24           And, you know, there is that sentencing downward

25    departure for someone who should not be punished for one day

1     of their life.

2            Mr. Alberts, you know, contrary to what the

3     government said, I believe he did express some regrets.  He

4     didn't do things perfectly.  He has accepted some

5     responsibility.  He shouldn't be punished for the things he

6     did on January 6th over -- other than the offenses he was

7     convicted of.  He deserves a downward departure because he

8     has lived a stellar life.

9            He has testified he actually worked on security

10    details in the military protecting Barack Obama.  He

11    actually has been a protector of people and a rescuer, a

12    first responder, and I would say not at his job, but as a

13    volunteer, volunteer first responder.  When people are

14    choking in a casino in or a restaurant, when people are

15    having a heart attack, he's the first guy who shows up to

16    help.

17           Again, with regard to the firearms, remember, the

18    U.S. Supreme Court came out with that decision that said

19    that the Second Amendment right to bear arms is a right to

20    wear arms in the public.

21           Now, there's disagreement, and we can quibble

22    about the boundaries.  The Supreme Court did say that, you

23    know, sensitive areas do not have that protection, but

24    nothing in Mr. Alberts's possession of the firearm bears

25    anything -- any resemblance to an intent to be a criminal.

1    It's -- he clearly testified that it's a defensive thing

2    that he wears as a tow truck driver.

3         And by the way, he was not allowed to talk about

4    some of the crime that he had experienced, and he had had

5    issues where he had been intimidated.  People had drawn

6    weapons on him in his job.  He wears a gun on him for self-

7    protection as a tow truck driver, and, you know, we actually

8    forgot to put some of that in the record.  Hopefully he can

9    discuss some of that.  But he really is entitled to a

10   downward departure.

11        And my final point about Guy Reffitt, Guy Reffitt

12   was convicted of more serious crimes than Mr. Alberts.  Guy

13   Reffitt was convicted of obstructing an official proceeding,

14   which is an up-to-20-year federal felony.

15        Mr. Alberts was not convicted of that, not

16   even accused of that, so he was -- Alberts is convicted

17   of much lower crimes.  So the disparity issue with him

18   and Mr. Reffitt, by all calculations under the guidelines,

19   Mr. Reffitt was -- Mr. Alberts should be sentenced to a

20   lower sentence than Guy Reffitt should be.

21        And with that, I thank you.

22        THE COURT:  Thank you.

23        Mr. Nohria, do you want to address Ms. Grimes and

24   the alleged disparity with respect to other political

25   protests in D.C.?

1          MR. KONIG:  May I address that, Your Honor?

2          THE COURT:  You may.  Good to see you, Mr. Konig.

3          MR. KONIG:  Thank you, Your Honor.  I'll address

4    this because it's been addressed in response to defendant's

5    motion to dismiss for selective prosecution.  In that

6    instance, the Court rejected that argument.

7          As I recall, Ms. Grimes was an individual who was

8    pulled over miles from the Capitol building on January 6th.

9    In her trunk was a firearm.  As I understand -- this is only

10   from press reports because only press reports were provided

11   to the Court in the motion to dismiss -- it turned out that

12   this was a firearm that was not Ms. Grimes's firearm, and

13   she claimed she was unaware of it.

14         To my best understanding, either charges were

15   dismissed or no charges were filed, but it is a far, far

16   different case than here where an individual was on the

17   Capitol grounds for well over six hours with a loaded

18   firearm and was arrested on those Capitol grounds with that

19   firearm, you know, after the other number of offenses for

20   which he's now been convicted.

21         Again, the Court, when it's deciding the 3553(a)

22   factor for sentencing disparities, is required to consider

23   sentencing for an individual committing the same offense

24   with the same criminal history, and so the 3553(a) factors

25   do not consider people who were somewhere else having been

1    charged for the offense, were in a different place, were

2    in -- were committing allegedly violations of 18 USC 1512,

3    which was not charged in this case, and for which the Court

4    is not sentencing Mr. Alberts.

5           So it's just entirely inapposite to the Court's

6    role here and the Court's task here of fashioning an

7    appropriate sentence.

8           THE COURT:  Okay.  Thank you.

9           All right.  Mr. Alberts, anything you want to tell

10   me before I impose your sentence?

11          Or any other witnesses, Mr. Roots, before we get

12   to Mr. Alberts?

13          MR. ROOTS:  If we could just have five minutes?

14   We might have a discussion with some of the people, because

15   I don't believe they're really prepped or prepared; so I

16   want to see if they are, you know, wanting to and this kind

17   of thing.  If we can just have a five-minute break?

18          THE COURT:  We'll take a brief five-minute recess.

19          (Recess taken)

20          MR. ROOTS:  Thank you for that, Your Honor.

21          Yes, we do have some of Mr. Alberts's -- his

22   fiancee and his really -- his extended family who would like

23   to say a few things.

24          The first one I would call would be how about

25   Georgina Miller.  This is the mother of Mr. Alberts's

1      fiancee.

2                  THE COURT:  Step right up, ma'am.

3             Good morning.

4                  MS. GEORGINA MILLER:  Good morning, Your Honor.  I

5      won't be able to say too much because I just lost my son, so

6      one of the things I want to say is that throughout this

7      Chris has been our rock.  He carried my daughter and myself

8      and my other daughter and her significant other through

9      that, through the tragedy of losing my only son.

10                 I can just say that he is a wonderful man to my

11     daughter.  He takes care of her when she's sick.  If I need

12     anything -- they live in Maryland; I'm in New Jersey -- they

13     will just drop everything and come to take care of their

14     family.

15                 And Chris's counsel talked about the lives that

16     Chris has saved.  I was at the beach with him one time, and

17     there were some kids that were caught in a riptide, and it's

18     always his first instinct when we're together.  And I've

19     seen it on more than one occasion.

20                 I believe it was 2016, my niece was getting

21     married in Santa Cruz, and her sister had a small baby.  Her

22     name is Rose.  And, you know, we're all preparing and

23     celebrating, getting ready for the ceremony in a place

24     that was rented for us all to be together, and all of a

25     sudden Chris notices that the baby's choking.  The baby's

1    choking on something.  I believe she was in a walker.

2          And he just -- he always goes to that instinct to

3    help somebody, to save somebody.  And he just started going

4    like, "The baby, the baby, the baby's chocking, the baby's

5    choking."  He like picked her up and gave him -- and he did

6    that maneuver.  And he wasn't feeling her breathing, and he

7    just kept doing it.  And we were ready to call 911, and he

8    said, "I got it.  I got it.  She's okay."

9          Like I said, I really -- you know, I just lost my

10   son on Wednesday, so I -- I can't say too much because of,

11   you know, my state of grief.

12          THE COURT:  Thank you.

13          MS. MILLER:  But thank you for hearing me, Your

14   Honor.

15          MR. ROOTS:  Thank you.

16          Also Christine Miller.

17          THE COURT:  Good afternoon.  Good morning still.

18          MS. CHRISTINE MILLER:  Good morning, Your Honor.

19   I'm kind of in the same predicament as my mom, losing my

20   brother, but I just want to say that, you know, Chris is a

21   really good guy.  He's really been there for my family.

22          You know, he does always spring into action like

23   my mom said.  Whenever there's -- I mean I've heard of him,

24   you know, stopping helping people in car accidents on the

25   side of the road.

1          And, you know, we do apologize to the officer that

2    got hurt, you know, and we definitely have empathy towards

3    his situation.

4          You know, Chris has never been in trouble.  He has

5    served our country, and my family really needs him.

6          Thank you.

7          THE COURT:  Thank you.

8          MR. ROOTS:  And Melissa Miller, who is

9    Mr. Alberts's significant other and fiancee.

10         MS. MELISSA MILLER:  Good morning, Your Honor.

11         THE COURT:  Good morning, ma'am.

12         MS. MELISSA MILLER:  Thank you for giving us the

13   opportunity to speak today.  I'm, you know, just like my

14   family, a little shaken up, so I'm sorry if I'm not very

15   clear and like consecutive with my thoughts.

16         I mean, there's many things from that day, and one

17   of the main things hearing the officer's story today that

18   really hit me was that feeling that he felt for his wife and

19   not being able to help somebody and just feeling really

20   helpless.  I remember the night that everything happened.  I

21   remember not wanting him to go.  I remember just having the

22   feeling that he wouldn't come back from something in my gut.

23         But I also honored and respected him as a man who

24   fought for our country and enlisted at 17 years old as if he

25   felt led, whether spiritually or because of what he's done

1    in his life, to go that I'm not going to keep my man from

2    doing what he thinks he should do.

3         But I sat home that night all by myself wondering

4    if he would ever come home, and the last video clip I seen

5    was a clip of him getting hit and then dropping to the

6    ground.  And I, too, know that feeling because I didn't know

7    if he was ever coming home.

8         So I sympathize with that, and I apologize that

9    you and your family had to go through that.  And I want to

10   look at you when I say that because I truly do.  And -- I'm

11   sorry.

12        I think to say that he's not remorseful would not

13   be a factual statement.  And I do feel it's emotional times,

14   and I do believe that everyone here is doing what they think

15   they're supposed to do, and they're doing their job and

16   what's right for the greater good.  I do believe his

17   constitutional rights should be protected as well.

18        But to say he's not remorseful is not true.  If

19   anybody could look at him right here in this room, there's

20   no one that's home with him every day besides me.  There's

21   no one that sees the mental toll this has put on him.

22   There's no one who is there besides me when he's upset, when

23   he feels like he failed me because he felt a need for

24   whatever reason to go that day.

25        But I do not believe that his entire life and all

1          the good that he's done should be judged based on a short

2          window of a time frame within one day.  Like I think he

3          deserves the opportunity to, you know, discuss the really

4          good things that have come from this entire process.

5                    I'm now a full-time paralegal student.  I feel

6          motivated to want to help people.  It's not about vengeance

7          or resentment.  I want to help people, and it really

8          inspired me to do that, and I never thought I would go back

9          to school.

10                   I'm part of our local elections.  I'm a chief

11         elections judge in our community.  It really has inspired

12         me, the things that have happened, because of this, and I

13         just try to see the silver linings in all of it.

14                   And he's become more of a faith-based man.  He's

15         become a better best friend.  He's become a better spouse.

16         And I think there's still a lot to be learned, and I don't

17         feel that putting him away for the next ten-plus years is

18         the necessary route to get that message clearly shown to

19         him.

20                   I believe that we need to use compassion.  We need

21         to use empathy.  There needs to be precedent followed, as

22         you know better than I do, right?  And I could be ignorant,

23         but I never in my life or in my studies have seen these

24         enhancements come in after a trial.  You know, there's a

25         question in my head.

1          And I just want to be completely honest.  You

2     know, had we known all these other things, who's to say

3     maybe he wouldn't have taken a plea deal.  So I don't

4     understand that completely.  You know, if we knew more would

5     come of this -- I didn't anticipate that.  I don't think

6     anybody really did.

7          But I think the biggest thing that hits close to

8     my heart is there were officers that day that were hurt.

9     There's families that have suffered.  My family has

10    suffered.  His family has suffered.  We've all suffered.

11    We've taken time.  We've taken expenses.  We've taken, you

12    know, from other things that may or may not be more serious

13    in the world right now.

14         You know, he was described as someone who didn't

15    retreat.  When you go into the military, you're trained to

16    move forward, to defend others.  If we went into World War

17    III tomorrow, we wouldn't want men or women who retreat.  So

18    when he's in his state of I guess no better way of saying it

19    than trauma and the chaos of that day, that you go into a

20    physical mental state of what is referred to usually as like

21    fight-or-flight mentality.  And I believe, knowing him as a

22    human being, that that is what happened to his mental state

23    that day.

24         So he's not going to think to retreat.  He's going

25    to think to protect or to evade and get away, if he needs to

1    get the spray out of his eyes or if that's where he feels he

2    can get to safety being on that stage.

3         I don't think he was putting on a show of any

4    sorts.  There may have been a lot of emotions and also some

5    feeding off of the crowd, but I think also in that chaos I

6    don't think he was acknowledging anything or anything was

7    motivating him to do anything other than just trying to

8    survive out there.

9         And I feel like we have a long way to go if all of

10   these cases are going to be turned into the good deeds of

11   certain people rather than, you know, the officers that have

12   suffered, the protesters who thought they were just going to

13   go protest and it would be like no other.

14        We have a long way to go with healing in this

15   country, and I just hope we get it.

16        THE COURT:  Thank you.

17        MS. MELISSA MILLER:  Thank you.  God bless.

18        MR. ROOTS:  Thank you.  And I believe Mr. Alberts

19   would like to speak.

20        THE COURT:  Why don't you both approach.

21        THE DEFENDANT:  Thank you, Your Honor.

22        THE COURT:  Good morning.

23        THE DEFENDANT:  Just so I can, Officer -- I didn't

24   get to address you during my trial -- if I caused you any

25   harm or nightmares or night terrors, because I've had my

1    same -- my share of them, I know how they tear you apart.

2    And to your wife, give her my best wishes.  I don't know if

3    that's her or if she's not here today, but I apologize for

4    any -- if I came in contact with that board and you, I am so

5    sorry.  I'm sorry for the guy who sprayed you behind me.

6              If I would have known that that was going to

7    happen on those steps, I would have stayed home.  If I would

8    have known that day was going to turn into what it turned

9    into, I would have stayed home.  I'm very sorry for my

10   actions, and I wish that you get over it and can grow and

11   heal from the pain I may have caused you.

12             Your Honor, there's been a lot of things said in

13   this court.  I addressed them on the stand in our other

14   courtroom.  A lot of my words are being used against me, and

15   we know people get heated in tense moments and say things.

16   I don't believe anything I said was a direct threat to

17   anybody.  I know I said some very hyperbolic things, and I

18   apologized for those during trial.  I even testified that

19   that was hyperbolic speech that is not like me.

20             As far as what I had that day we're calling the

21   ceramic plates in my vest, steel plates, and a lot of things

22   to twist and make my supposed mentality that day seem like I

23   was prepared for war, I did not expect that day to turn to

24   what it was.  I seriously would have stayed home.

25             Could I have followed my way back down the steps?

1    Yes.  But as my fiancee said, at the time I was in a fight-

2    or-flight mentality.  What I had been trained to do from 18

3    years old in the military was to stand my ground.  It was

4    not an offensive attack.  I wasn't trying to break into the

5    building.  As you said yourself, six hours on that grounds I

6    never brandished my weapon.

7         If me using that board in the manner I did to hurt

8    an officer and that officer is in this room today, I would

9    beg for his forgiveness.

10         I don't believe my actions physically hurt

11   anybody.  Emotionally I can understand.  It was a very tense

12   and scary day.  I myself had night terrors coming home that

13   I hadn't had for four years until that night.  I came home

14   on the 7th, and I had shook myself to sleep because I was

15   terrified.

16         I also witnessed deaths that day.  There was --

17   the government lied to you, Your Honor.  There's TC police

18   reports that state the people that died on the Capitol

19   grounds that day.  You can do a quick Google search.  All

20   you have to do is type in "January 6th deaths" and their

21   names come up.  So for the government to sit there and tell

22   you that they couldn't confirm that Benjamin Phillips died

23   on the grass that day in front of my vision, and that

24   Derrick Vargo was pushed off those steps and that the jury

25   was to disregard that because the government told you that

1    they couldn't confirm that they died, I have to live with

2    that man's face in my brain every day because I couldn't

3    help him like I've been able to help everybody else all my

4    life.

5            That's all I was trying to do, Your Honor, was

6    just trying to stop people from getting hurt.  If I really

7    wanted to, I could have went inside.  I could have went in

8    the building.  I could have brandished my firearm.  I could

9    have hurt people, seriously hurt people that day, and I

10   didn't.

11           My actions were wrong, but to say that I was the

12   leader of the -- the tip of the spear and the battering ram

13   and all this other -- I didn't go anywhere near the

14   entrance.

15           To say that I was there to stop the peaceful

16   transition of power, no, I wasn't.  I testified that I

17   wanted the proper procedures of January 6th to commence.  I

18   didn't want to stop anything.

19           If, at the end of the day, when they said Biden

20   was president and for us to go home -- all they had to do

21   was tell us to go home.  We left when we were told to get

22   off the property.  There was no warnings given to anybody

23   that day, and all I wanted was for people to be okay and

24   safe.

25           I couldn't stand watching women and children and

1    elderly people getting gassed and shot.  I just couldn't.

2            And, again, if what I did to stop that from -- bad

3    actors on both sides.  If what I did to stop that caused any

4    harm to any officers, I am extremely sorry.  But you've seen

5    the video.  You yourself said before -- after trial that the

6    assault wasn't that bad.

7            It was still assault.  I'm not denying that it was

8    assault -- well, it wasn't assault, but I didn't -- I wasn't

9    trying to hurt anybody.  I just wanted it all to stop.

10           Thank you, Your Honor.

11           THE COURT:  Thank you.  Stay up there.

12           All right.  Mr. Alberts, we have hundreds of these

13   cases, as you know.  Every one is different.  We talk a lot

14   about calculations --

15           (Defendant requests headphones)

16           THE DEFENDANT:  I'm sorry, Your Honor.  It helps a

17   little bit.

18           THE COURT:  We have a lot of these cases.  Every

19   one is different.  We talk about the calculations and the

20   guidelines range, but I want you to know that we try to

21   fashion an appropriate sentence for every defendant based on

22   what he or she has done and the surrounding circumstances,

23   okay?  And I've tried my best to do that in this case.

24           I'm not going to rehash everything that we've

25   talked about or that took place at trial, but let me just

1    address some of the high points and make a few observations

2    about some of the major themes of your defense starting with

3    your conduct.

4         I agree with Officer Sherman that you were a

5    leader.  You were not simply a bystander.  You were a major

6    participant who -- although you did not go into the

7    building, you played a significant role in the breach by

8    being the first rioter to physically engage with police at

9    the top of the northwest stairs, which led to the initial

10   breach of the building on the Upper West Terrace that we've

11   all seen in the videos, okay.

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  I think you knew exactly what was

14   going to happen.  You prepared for it.  You armed yourself.

15   You told your compatriots that you were taking over the

16   Capitol.  Your words, not mine.  And you protected yourself

17   from the inevitable law enforcement response with a gun, a

18   gas mask, and body armor.  Okay?  And those are just the

19   facts.

20        We take into account defendants' acceptance of

21   responsibility.  I appreciate your words today, but I don't

22   think that you have accepted responsibility for your actions

23   and your role that day.  There were people who died.  There

24   were nine or ten who either died that day or took their own

25   lives afterwards likely as a result of the trauma that they

1    suffered that day, okay?  Some protesters; some law

2    enforcement.

3            THE DEFENDANT:  Some National Guard, sir.

4            THE COURT:  And everyone who participated, and

5    certainly the ones who were at the front and were the first

6    ones there, like you were, bear some responsibility for

7    that.  And I haven't heard the remorse for what your actions

8    did to contribute to those deaths, even if you were only one

9    of thousands of people who were there that day.

10           Nor have I heard any remorse or acceptance of

11   responsibility for the effect on our democracy and on our

12   politics that January 6th had, and your actions were a part

13   of that.  Okay?  To the contrary.  You swore an oath when

14   you took the stand, and you spun a story that directly

15   contradicted the video evidence and a lot of common sense.

16   All right?  And I understand you're trying to get a verdict,

17   but, you know, you're entitled to go to trial, but you're

18   not entitled to lie on the stand.  All right?

19           And, you know, it's not my job to make you

20   remorseful.  It's not about bringing you to heel or

21   compliance.  It's about deterrence; the need to keep you and

22   others from doing anything like this ever again.

23           The Court also considers your Sentencing

24   Guidelines, and let me just say, you know, they're in this

25   book.  They apply in every criminal case.  Anyone who

1    practices law in this area knows that after a conviction,

2    either by plea or by trial, there is a very intricate

3    analysis of the guidelines range.  All right?  It's not as

4    if the government is pulling the wool over anybody's eyes.

5    Everyone knows that this would be the result.  All right?

6    And we apply those guidelines in every single case.

7         I don't have to follow them, if I find a good

8    reason for not following them, but it should come to no

9    surprise to anybody that we've spent all of this time and

10   probation spent all of this time calculating your guidelines

11   range.  All right?

12        And your guidelines are 78 to 97 months.  That's

13   high, and they're high because they reflect the seriousness

14   of your offenses for all the reasons that we went through

15   earlier in this hearing.

16        And just one more observation on that.  You know,

17   you chose to go to trial.  That was your right.  And you

18   chose to take the stand, and that was your right as well.

19   But as a result of those decisions and what you said on the

20   stand about five levels were added to your offense, okay?

21   And you may disagree with that, but that added about two and

22   a half years to your advisory guidelines range, all right.

23   And those were decisions that you made.  And you're

24   represented, and you should have known the consequences or

25   the potential consequences for those decisions.

1          Now, we also consider your history.  None of this

2     is to say that you're a bad guy, all right, or that you

3     don't have commendable personal qualities.  We've heard

4     about some of them today.  I appreciate that.  Your

5     compassion, your assistance to others, the support that

6     you've given to your family, your service to your country.

7     All of those things are important and can never be taken

8     away from you.

9          They're also inconsistent with your actions in

10    this case.  All right.  And I see that with a lot of other

11    January 6th defendants, all right, who are patriots, who

12    served in the military, who view themselves as patriots, who

13    are loyal.

14          Not everyone, but many.

15          And I don't know if you've ever reflected on this,

16    but it seems to me that other folks may have manipulated

17    some of those traits in convincing some folks to come to

18    Washington that day and then to engage in what they have

19    done, all right?  So that's something that you might want to

20    consider.

21          To address the downward departure request, all

22    right, there is a downward departure under 5K2.20 for

23    abhorrent behavior.  Occasionally the Court has applied that

24    downward departure.  It does not apply here, however,

25    because based on the guidelines in the book, it's limited to

1   offenses that were committed without serious planning -- you

2   planned this -- and also limited to offenses that were of

3   limited duration.  You were there for six hours.  You had

4   plenty of chances to extricate yourself, but you didn't do

5   it.  So that particular downward departure does not apply in

6   this case.

7          But let me touch on a couple of major themes in

8   your trial.  We've heard them here today.  We've seen them

9   in the pretrial motions and the post-trial motions.

10          The first, the notion that you are here simply

11   exercising your First Amendment rights.  You testified that

12   you only wanted to make your voice heard, if you recall.

13   This case has nothing to do with the First Amendment.  You

14   had plenty of ways to make your voice heard.  You could

15   write your congressman.  You could protest at the Ellipse.

16   You could march up Pennsylvania Avenue.  You could apply for

17   a permit and hold a rally in one of the designated areas.

18   You could stand outside the grounds and scream to the

19   rooftops whatever views you wanted to express.  All right?

20          But in this country you can't make your voice

21   heard by helping a mob storm the Capitol by overrunning

22   police with a wooden pallet, a gas mask, and a gun.  That is

23   not legitimate First Amendment activity.  That's mob rule,

24   all right, which is exactly the opposite of what the

25   Founding Fathers envisioned when they wrote that

1    Constitution that you say you care so much about.

2         And you say it was -- your words were just

3    hyperbolic and rhetoric.  You know, you're free to express

4    your views, all right, but your words aren't free.  They

5    have consequences.  And one of the consequences here is that

6    they reveal what your intent was, so they're relevant to the

7    charges that you were convicted of.

8         A lot of talk about the Second Amendment.  Again,

9    no Second Amendment right to bring your gun to the Capitol.

10   No Second Amendment right to bring a pistol into Washington,

11   D.C., without a license.  You may disagree with that.  You

12   may think the Supreme Court should change its interpretation

13   of the law, and maybe it will some day.  But until it does,

14   you're not free to break the law just because you don't

15   agree with it.  All right.

16        There are a lot of guns in D.C.  You are not being

17   singled out.  There isn't a week or a month that goes by

18   that I don't sentence a young man in D.C. on a gun offense.

19   I had a sentencing -- I sentenced a kid yesterday, and I

20   have one this afternoon.  All right.  So you're not being

21   singled out.

22        And they often say, "I'm just protecting myself,"

23   right?  "It's for self-defense.  It's a dangerous city.  I

24   live in a dangerous neighborhood.  I need it for self-

25   defense."  But as long as we have laws, people have to

1    follow them.

2            You testified that you were here and brought your

3    gun just to help people, all right.  You certainly didn't

4    help the police, you know, by disobeying their instructions,

5    by charging up the steps, by trying to break their line of

6    defense, by waving other rioters through and putting the

7    police's lives in danger, by making it harder for them to

8    clear the building, by calling them MFers and traitors, by

9    throwing water bottles at them.  That's not helping the

10   police, all right?  That's the opposite.

11           Nor did I see you helping a lot of the other

12   rioters either.  You talk about Mr. Reffitt.  You say you

13   were trying to help him at the top of the steps, but you

14   went right past him.  If you would have helped -- if you

15   wanted to help, you would have told them all to stand down

16   and leave.  All right.

17           You testified that all you wanted was an

18   investigation.  You just wanted Congress to do its job.

19           There were investigations.  There were lawsuits,

20   over 60 of them, and that's how allegations of election

21   fraud are dealt with in a country of laws.  And all of those

22   cases were tossed out by the Court because there wasn't

23   evidence to back them up; by judges appointed by presidents

24   from both parties, including President Trump.  And the job

25   that Congress had to do that day, which is set out in the

1    very Constitution that you cherish, was not to investigate

2    allegations of fraud in Georgia or in Arizona or anywhere

3    else.  It was to debate whether to accept the votes

4    certified by the states, and you and the others there that

5    day kept them from doing that job.

6            We've heard a lot about Antifa and BLM and other

7    political protests.

8            The protests in 2020 in response to the George

9    Floyd murder and police treatment of people of color

10   occurred all over the country and took many forms.  By all

11   accounts, most were peaceful and within the bounds of

12   legitimate political discourse, but some, if not many,

13   people went too far, all right.  Most of those who were

14   charged were prosecuted at the state level because it

15   happened all across the country, not just here in

16   Washington.  But according to Department of Justice

17   statements, at least 300 federal prosecutions resulted as

18   well, including for some of the same crimes that were

19   implicated in January 6th:  arson, illegal gun possession,

20   civil disorder.

21           I didn't have any of those cases, all right.  I

22   can't say how the charges or the outcomes compare to what

23   I've seen in the J6 cases before me, but as many of my

24   colleagues have observed, January 6th was not just another

25   political protest, all right, be it from the left or the

1    right.  And we see political protests from all sides in

2    Washington, D.C., virtually every week.

3         Never before has a violent mob stormed the Capitol

4    in an attempt to overturn the results of a democratic

5    election without any evidence or findings that the election

6    was fraudulent.  And you can rest assured that if any BLM

7    members or Antifa members had done that and come before me,

8    they would be treated exactly the same way as I've treated

9    all of my January 6th defendants who I have sentenced to

10   probation and up to multiple years.

11        So considering all of the factors, particularly

12   your advanced preparations and direct facilitation and

13   encouragement of the riot, including the initial breach,

14   which even though you weren't charged with it contributed to

15   the interruption of the certification, the fact that you

16   were one of the first to arrive and one of the last to

17   leave, your affirmative interference with law enforcement's

18   efforts to quell the riot, the fact that you carried a

19   loaded gun the entire time you were there and your lack of

20   acceptance of responsibility and your untruthful testimony,

21   I think a guidelines range sentence is appropriate in this

22   case.

23        So with that, pursuant to the Sentencing Reform

24   Act of 1984 and in consideration of the provisions of 18 USC

25   3553, as well as the advisory Sentencing Guidelines, it is

1    the judgment of the Court that you, Christopher Michael

2    Alberts, are hereby committed to the custody of the Bureau

3    of Prisons for a term of 84 months, which consists of

4    concurrent terms of 84 months as to Counts 2, 3, and 4; 60

5    months as to Counts 1 and 6; 12 months as to Count 5; and

6    six months as to Counts 7 and 9.

7            You are further sentenced to serve a concurrent

8    36-month term of supervised release which consists of 36

9    months as to Counts 1, 2, 3, 4, 6, and 9, and 12 months as

10   to Count 5.

11           In addition, you are ordered to pay a special

12   assessment of $645 in accordance with 18 USC 3013.

13           While on supervision, you shall abide by the

14   following mandatory conditions as well as all discretionary

15   conditions recommended by the probation office in the

16   "Sentencing Options" section of the presentence report,

17   which are imposed to establish the basic expectations for

18   your conduct while on supervision.

19           The mandatory conditions include you must not

20   commit another federal, state, or local crime.  You must not

21   unlawfully possess a controlled substance.  You must refrain

22   from any unlawful use of a controlled substance.  You must

23   submit to one drug test within 15 days of placement on

24   supervision and at least two periodic tests thereafter as

25   determined by the Court.

1      You must cooperate in the collection of DNA as

2    directed by your probation officer.

3      You must make restitution in accordance with 18

4    USC 3663 and 3663A or any other statute authorizing a

5    sentence of restitution.

6      As to restitution, the Victim and Witness

7    Restitution Act authorizes the Court to impose restitution

8    upon any conviction of an offense in Title 18 of the United

9    States Code which includes at least one of the offenses that

10    you have been convicted of.  The government has shown by

11    preponderance of the evidence, namely the letters that it

12    has submitted from the Architect of the Capitol in other

13    cases which the Court takes judicial notice of, that the

14    riots caused -- I think the last count I saw was over $2

15    million in damages.  The Court finds that those agencies,

16    the Architect of the Capitol and other entities responsible

17    for the Capitol, were the victims of the riots as

18    contemplated by the statute.

19      The government has further established that $2,000

20    is a reasonable estimate of how much of the damage should be

21    apportioned to Mr. Alberts, which is consistent with what

22    other defendants have agreed to in their plea agreements.

23    The restitution shall be made to the Architect of the

24    Capitol via the Clerk of the Court for this court.

25      You shall also comply with the following special

1    conditions.

2         Financial information disclosure.  You must

3    provide the probation officer access to any requested

4    financial information and authorize the release of any

5    financial information.  The probation office may share

6    financial information with the U.S. Attorney's Office.

7         Financial restrictions.  You must not incur new

8    credit charges or open additional lines of credit without

9    the approval of your probation officer.

10         Substance abuse testing.  You must submit to

11    substance abuse testing to determine if you have used a

12    prohibited substance.  You must not attempt to obstruct or

13    tamper with the testing methods.

14         Ms. Field, you have recommended a mental health

15    treatment condition.  Is that necessary?  You can address

16    the Court from the table.

17         THE PROBATION OFFICER:  Thank you, Your Honor.  It

18    was based on his self-reporting depression --

19         THE COURT:  Okay.

20         THE PROBATION OFFICER:  -- concerns.  And that was

21    the reason for the recommendation.

22         THE COURT:  All right.  The Court will order a

23    mental health assessment, and based on that assessment the

24    probation officer will determine whether a treatment

25    condition should be recommended to the Court, okay?

1              The Court finds that you do not have the ability

2     to pay a fine and, therefore, waives imposition of a fine in

3     this case.  The financial obligations are immediately

4     payable to the Clerk of the Court.  Within 30 days of any

5     change of address, you shall notify the Clerk of the Court

6     of the change until such time as the financial obligation is

7     paid in full.

8              As to the D.C. count, Count 9, the financial

9     obligations are immediately payable to the District of

10    Columbia Superior Court.  The address will be in the

11    judgment.

12             The probation office shall release the presentence

13    investigation report to all appropriate agencies, including

14    the United States Probation Office in the approved district

15    of residence in order to execute the sentence of the Court.

16    Treatment agencies shall return the presentence report to

17    the probation office upon the defendant's completion or

18    termination from treatment.

19             You have the right to appeal your conviction of

20    guilt to the United States Court of Appeals for the D.C.

21    Circuit.

22             You also have a statutory right to appeal your

23    sentence to the D.C. Circuit under certain circumstances,

24    including if you think the sentence was imposed in violation

25    of law or as a result of an incorrect application of the

1    Sentencing Guidelines or is more severe than the maximum

2    established in the guidelines range.

3            You may also appeal your sentence if you believe

4    you received ineffective assistance of counsel at

5    sentencing.

6            On that note, the Court will state for the record

7    that the sentence would have been the same if the Court did

8    not apply the four-level enhancement for the wooden pallet

9    as opposed to the three-level enhancement for the benefit of

10   the Court of Appeals.

11           Pursuant to 28 USC 2255, you also have the right

12   to challenge the conviction entered or the sentence imposed

13   to the extent permitted by that statute.  Any notice of

14   appeal must be filed within 14 days after entry of judgment

15   or within 14 days of the filing of a notice of appeal by the

16   government.

17           If you are unable to afford the cost of an appeal,

18   you may request permission from the Court to file an appeal

19   without cost to you.  On appeal you may also apply for

20   court-appointed counsel.

21           Any other objections to the sentence for the

22   record, Mr. Nohria?

23           MR. NOHRIA:  Your Honor, I may have missed it, but

24   I just wanted to check on the mandatory special assessment

25   fee.  Was that already addressed by the Court?

```
1              THE COURT:  $645.

2              MR. NOHRIA:  Okay.  Excellent.  No further

3    objections, Your Honor.

4              THE COURT:  Mr. Roots.

5              MR. ROOTS:  Well, I think we would -- this

6    financial information, the idea that he can't open new

7    credit, I don't believe there's any justification -- there's

8    any reason for that.  I don't believe he's been accused of

9    any financial issues or anything like that, so I don't know

10   why that is added as a special condition.

11             THE COURT:  It's there because there are financial

12   obligations as part of the sentencing, including $2,000 of

13   restitution.  There will be a payment schedule in the J&C

14   for the restitution.

15             Anything else or any placement recommendations,

16   Mr. Roots?

17             MR. ROOTS:  We would ask that he be placed as

18   close to the Maryland area as possible.

19             THE COURT:  The Court will --

20             MR. ROOTS:  He reminded me that he has hearing

21   aids that have to be charged every day, so he wants -- you

22   know, he needs to be in some situation where he's able to

23   charge his hearing aid every day.

24             THE COURT:  The Court will make a recommendation

25   to a facility in proximity to Mr. Alberts's home.  Any
```

1    medical issues will have to be dealt with by BOP.

2           MR. ROOTS:  With regard to his surrender

3    situation --

4           THE COURT:  Mr. Alberts, you can have a seat.

5           THE DEFENDANT:  Thank you, Your Honor.

6           THE COURT:  Mr. Nohria, you want to be heard on

7    surrender?

8           MR. KONIG:  Your Honor, we do reurge step-back.

9    We urged it at the end of the trial when 18 USC 3143(a)

10   applied for release pending sentence.  We are now in a

11   situation where 3143(b) applies where it is -- the Court

12   must find by clear and convincing evidence a number of

13   things or the defendant shall be detained.

14          First, that the defendant is not likely to flee or

15   pose a danger to the safety of another person or the

16   community, and also essentially that he's likely to prevail

17   on appeal or have his sentence reduced in some meaningful

18   way.

19          We don't believe that that finding is appropriate

20   in this case.  For the first time in his life this defendant

21   is going to jail, and it's for a long time.  The Court has

22   already made a number of findings and statements that

23   reflect that the defendant has not shown remorse for his

24   violent conduct even after seeing the videos and events of

25   that day.

1              As Mr. Nohria said in his argument, the defendant

2      decides which laws that he believes are worth abiding by and

3      those that are not that are the result of tyranny.

4              And so with that burden shift and all the evidence

5      before the Court in the trial, we believe that he should be

6      stepped back.

7              THE COURT:  Was Mr. Reffitt stepped back?

8              MR. KONIG:  I think he might have been detained

9      prior to trial.

10             THE COURT:  I guess we don't know.

11             Mr. Roots.

12             MR. ROOTS:  I don't know if Mr. -- well, I think

13     someone who knows him may be here who could answer that, but

14     I don't know the answer.

15             I will say that Mr. Alberts has really been a

16     model person on pretrial release.  He's been -- he's

17     complied with every single requirement.  He's been wearing

18     an ankle monitor this entire time.  I don't believe there's

19     been any episodes or any accusations or any improprieties.

20             I think at one time the last -- right at the end

21     of the trial the prosecution said that he had attended the

22     D.C. Jail vigil, but he had done so at my request because I

23     was his attorney, and one of his conditions was you shall

24     not come to D.C. without your attorney.  And we were

25     actually meeting with a prospective witness in the case at

1    that vigil, and -- who didn't end up being a witness.

2          But anyways, so I'll just take full responsibility

3    myself.  It wasn't even Mr. Alberts's idea.  I took him to

4    that vigil to -- we were meeting with some potential

5    witnesses.

6          He has been a model -- a model.  And I'd say he's

7    been a model throughout.  He has complied.  He's an officer.

8    He's been in the military, very commendable military record.

9    He's never been a flight risk.  No one's ever accused him of

10   not showing up at a court date ever in his entire life.

11   He's a person who complies with those kinds of strictures.

12   And there's no issue with regard to dangerousness.  He's

13   never -- no one -- he's never had any issues with regard to

14   that.

15          So we just think it's -- he can -- he should be

16   able to self-surrender on this.

17          THE COURT:  Okay.  The Court finds by clear and

18   convincing evidence that Mr. Alberts does not pose a danger

19   to the community nor is he likely to flee prior to his

20   report date.

21          Mr. Alberts --

22          THE DEFENDANT:  Your Honor.

23          THE COURT:  Yes.

24          -- obviously it would not be a wise decision not

25   to show up.  You will get directions on where to report and

1    when, and it would not be prudent for you or your family

2    members or anyone else for you to not comply with those

3    directions.  Okay?  And I fully expect that you will.

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Okay.

6              All right.  With that, we are adjourned.

7              Mr. Alberts, good luck to you.

8              Ms. Field?

9              THE PROBATION OFFICER:  Yes, Your Honor, if I may?

10    The payment schedule for the restitution, if the Court would

11    just set a specific amount each month for him to pay.

12              THE COURT:  What does probation recommend?  $200 a

13    month for ten months, is that the standard?

14              THE PROBATION OFFICER:  In consideration of the --

15    it's my understanding he does have a negative net worth and

16    negative monthly cash flow.  We would recommend $100 per

17    month.

18              THE COURT:  For a period of 20 months?

19              THE PROBATION OFFICER:  Correct.

20              THE COURT:  Yes, the Court will impose that

21    schedule.  It will be set forth in the J&C.

22              THE PROBATION OFFICER:  Thank you.

23              THE COURT:  All right.

24              MR. ROOTS:  Mr. Alberts just requested Fort Dix.

25    Now Fort Dix is a Bureau of Prisons facility close to him,

 1   and I believe it has several levels, so it would probably

 2   accommodate him.  So we do request if maybe Your Honor could

 3   recommend Fort Dix.

 4           THE COURT:  I will consider that.  BOP deals with

 5   security placements, but I will recommend somewhere close.

 6           All right.  Mr. Alberts, good luck to you.

 7           THE DEFENDANT:  Thank you, Your Honor.

 8           THE COURT:  Do your best to put this behind you.

 9   I know it's a long time, but you have supportive family.  I

10   was very impressed by Ms. Dickson [sic].

11           And so I tell people that they shouldn't be judged

12   by the worst mistake that they made.  This is obviously a

13   very serious one, but let's put this behind us, and you'll

14   still be a young man, all right?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  We're adjourned.

17               (Whereupon the hearing was

18                concluded at 12:15 p.m.)

19

20

21

22

23

24

25

1                    <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8         Dated this 8th day of August, 2023.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25